[Civ. No. 23375. Second Dist., Div. Two. May 22, 1959.]

BERG METALS CORPORATION (a Corporation), Respondent, v. HARRY R. WILSON et al., Appellants.

Alford P. Olmstead, in pro. per., Wendell P. Hubbard and Bruce Auerbach for Appellants.

J. George Bragin and Sidney Munshin for Respondent.

ASHBURN, J.—Plaintiff, as successor in interest to Berg Metals Company, recovered judgment for $14,374.58 from defendants-appellants Harry R. Wilson, Jeanette Reifsnyder (frequently written Reif Snyder in the record), and Alford P.

Olmstead upon a written guaranty. Other guarantors were Nathan Hochman and Bruce Irwin Hochman, but they were not served with summons.

Appellants raise two major points, (1) that the guaranty was not a continuing one and did not cover the indebtedness upon which the judgment is based, (2) that the guaranty was one of collection and the defendants were released by failure of plaintiff to proceed diligently in an effort to collect from International Steel, Inc., the principal debtor.

Berg Metals Company and International Steel, Inc., were both engaged in the business of buying, preparing and selling scrap iron and steel, the former acting as broker for the latter. In January and February, 1950, they made two written agreements which constituted Berg Metals the sole broker for International Steel, provided for certain advances to be made by Berg to International and specified that such indebtedness be paid by application thereto of one dollar per ton for each ton of scrap sold by International through Berg. Bruce Irwin Hochman, Jeanette Reifsnyder, Harry R. Wilson and Alford P. Olmstead, owned all the stock of International, which needed additional operating funds. Acting principally through Olmstead, who was an attorney and an officer of International, they induced Berg Metals to make the two contracts and to furnish such additional funds to International. The agency and authority of Olmstead to act for the other stockholders, especially the appellants, is not questioned.

The first agreement is dated January 3, 1950, signed by International, all of its stockholders and Berg Metals. At that time Berg Metals was already acting as broker for International, which was indebted to Berg, the debt having arisen through brokerage transactions as follows: When a car of scrap was shipped or about to be shipped by International it would notify Berg Metals which would forthwith advance 90 per cent of the estimated selling price (dependent upon ultimate weight) to International, later reimbursing itself from the proceeds of sale when received from the buyer. Some of these advances were made against bills of lading, some upon oral advice from International. This course of business had been established at the time the contracts under consideration were made. Later it developed that in certain instances the shipment was not actually made or was rejected by the buyer.

The agreement of January 3, 1950 (which counsel term the indemnity agreement) starts with these recitals:

"WHEREAS, International Steel, Inc., has from time to time borrowed money from Berg Metals Co., and is now indebted to it on account of said loans; and WHEREAS, International Steel, Inc., desires to borrow additional sums of money from Berg Metals Co., the total indebtedness of which at any one time shall not exceed Fifteen Thousand ($15,000.00) Dollars; and WHEREAS, Berg Metals Co. has agreed to lend International Steel, Inc., a sum of money up to the extent of Fifteen Thousand ($15,000.00) Dollars, provided the monies and sums already loaned and the monies to be loaned shall be secured as hereinafter provided for in this agreement.'' These are followed by a recital of the stock holdings in International. Next are recitals as to the ownership of the land and plant on and in which International was doing business, it being stated that same were owned by the estates and heirs of J. C. Wilson, deceased, and Robert Wilson, deceased, and certain others including defendants Harry R. Wilson and Jeanette Reifsnyder; that it was intended upon the closing of those estates that the land and plant would be transferred to International for a price that would be represented by a first trust deed and chattel mortgage for approximately $75,000; that this would be done as soon as said estates were closed and that an estimated period of six months from date would be sufficient time to accomplish same; that the stockholders of International desired Berg Metals to make said loans to International "so that the latter may better continue its operations to the benefit of the undersigned.'' It was therefore agreed "as an inducement and consideration to Berg Metals Co. to make the additional loans to International Steel, Inc.'': 1. That the stockholders would cause said transfer to be made to International in exchange for a first trust deed and chattel mortgage of $75,000 or thereabouts; 2. International agrees with Berg immediately upon receiving title to said land, buildings and equipment, to execute in favor of Berg a second lien trust deed and chattel mortgage, subject to said $75,000 lien, which second liens "shall be executed for the purpose of securing payment of the Fifteen Thousand ($15,000.00) Dollar indebtedness to Berg Metals Co. herein referred to, and which indebtedness shall be repaid in the manner and at the times as is set forth in an agreement of even date hereof entered into between Berg Metals Co. and International Steel, Inc.'' Paragraph 3 provides that in the event of failure of International to pay its indebtedness "as provided for in the said agreement between International Steel, Inc. and Berg Metals Co.,''

or should the holders of the first liens be compelled to foreclose, thereby rendering the second liens valueless, Berg should receive an assignment of an interest in the first liens "sufficient to protect it . . . from any loss for any money or sums remaining unpaid pursuant to the *loans up to* Fifteen Thousand ($15,000.00) Dollars herein referred to." (Emphasis added.) Paragraph 4 provides that if International should fail to receive complete title to the plant property "or in the event International Steel, Inc. for any reason whatsoever fails to deliver and give to Berg Metals Co. a Second Trust Deed and Second Chattel Mortgage as hereinbefore mentioned within six (6) months hereafter, that then, and in either one of said events, Alford P. Olmstead, Bruce Irwin Hochman, Janet Reif Snyder, Harry R. Wilson and Nathan Hochman hereby agree to personally and individually indemnify Berg Metals Co. and hold it harmless from any loss or damage that it may sustain thereby, limiting, however, said loss and damage to the extent of any unpaid balance owing by International Steel, Inc. to Berg Metals Co." Paragraph 5 states that in the event of inability of the undersigned (meaning the guarantors) to cause the Wilson estates to perform the acts designated for them, then "Alford P. Olmstead, Bruce Irwin Hochman, Janet Reif Snyder, Harry R. Wilson and Nathan Hochman do hereby agree to personally and individually indemnify Berg Metals Co. and hold it harmless for any loss or damage that it may sustain thereby, limiting, however, said loss and damage to the extent of any unpaid balance owing by International Steel, Inc. to Berg Metals Co."

The reference in paragraph 2 to an "agreement of even date hereof" is inaccurate; there is no other agreement bearing that date, but the proof plainly shows that this language referred to a so-called brokerage agreement which bears date January 6, 1950, and was actually executed and delivered in the month of February, on or after the 15th.

That agreement recites that "International Steel has heretofore borrowed certain monies from Berg Metals and now requires an additional amount of money, the total of the monies heretofore borrowed and presently to be borrowed, totalling Fifteen Thousand ($15,000.00) Dollars, which sum International Steel requires to operate its business." It was therefore agreed that "in consideration of the sum of Fifteen Thousand ($15,000.00) Dollars loaned by Berg Metals to International Steel, receipt of which is hereby acknowledged

by International Steel''; ''1. International Steel does hereby acknowledge that as of this day, January 6th, 1950, it is indebted to Berg Metals in the sum of Fifteen Thousand ($15,000.00) Dollars as evidenced by a promissory note of even date repayable in the manner as hereinafter set forth, without interest.''

Parenthetically it should be observed that the $15,000 had not been advanced in a single sum on January 6, 1950, or at any other time; that the debt on that date was $16,783.43, all of which had been built up through a series of advances made against shipments. Likewise, the reference to a promissory note of even date evidencing a $15,000 debt is a false one, for there never was any such note and the attorneys who handled the matter for the respective parties (i.e., Mr. Bragin for Berg Metals, and Mr. Olmstead for appellants) agreed that a note would be impractical because of the fluctuating amount of the debt. They also expressly agreed that the guaranty would pertain only to advances up to $15,000 and for anything beyond that amount ''they would not be responsible for under the guaranty.''

Paragraph 2 of said agreement dated January 6, 1950, specifies that Berg shall be International's exclusive broker in the sale of scrap iron and steel so long as any part of the loan should remain unpaid. ''For the purpose of repaying the aforementioned Fifteen Thousand ($15,000.00) Dollar loan, International Steel does hereby· agree to pay to Berg Metals one ($1.00) Dollar per ton for each ton of scrap iron and steel sold through Berg Metals pursuant to the aforementioned brokerage arrangement; at the time of each said sale the aforementioned $1.00 per ton shall become due and owing to Berg Metals and the payment thereof shall be made by International Steel at such time as the latter shall be paid for each shipment by the purchaser thereof; said payments of $1.00 per ton shall be applied by Berg Metals toward the reduction and payment of the said loan of Fifteen Thousand ($15,000.00) Dollars; mill specifications and weight receipts shall govern the final settlement of each shipment.''

▇▇ Counsel in their arguments term the January 3 instrument an indemnity agreement, but those arguments are predicated upon the assumption that it is a guaranty. This seems to be correct, for the agreement was to protect plaintiff from loss due to default of another, not its own failure to perform any obligation. which it had undertaken. (See

*Mahana* v. *Alexander*, 88 Cal.App. 111, 116-117 [263 P. 260] ; *Ingalls* v. *Bell*, 43 Cal.App.2d 356, 367 [110 P.2d 1068] ; *Somers* v. *United States F. & G. Co.*, 191 Cal. 542, 547 [217 P. 746] ; *Fageol T. & C. Co.* v. *Pacific Indemnity Co.*, 18 Cal. 2d 748, 751 [117 P.2d 669] ; *Everts* v. *Matteson*, 21 Cal.2d 437, 446 [132 P.2d 476] ; 26 Cal.Jur.2d, § 4, p. 332; 46 Cal. Jur.2d, § 7, p. 194; 42 C.J.S., § 3, p. 567.)

Appellants argue that the two instruments are to be construed as a single agreement and that it is limited to the guaranty of a single loan of $15,000, which was paid with resulting release of their obligation as guarantors; also that plaintiff's permitting the debt to exceed $15,000 from time to time worked a material change in the contract and hence released the guarantors. Respondent takes the position that the contracts were separate and to be construed independently; that the indemnity agreement is a continuing guaranty and the fact that the debt may have exceeded $15,000 from time to time is legally inconsequential, for the $15,000 is a limit upon the guarantors' obligation, but not a limit upon the permissible debt of International.

 While we do not consider this matter important to the result, we agree with appellants that the two instruments are to be construed as one agreement. They are but parts of a single transaction; this is manifest on their face and plainly appears from the oral evidence. The fact that they were not executed contemporaneously is not decisive (*Goodspeed* v. *Great Western Power Co.*, 33 Cal.App.2d 245, 266 [91 P.2d 623, 92 P.2d 410] ; *Lynch* v. *Bank of America*, 2 Cal.App.2d 214, 223 [37 P.2d 716] ; *Cadigan* v. *American Trust Co.*, 131 Cal.App.2d 780, 786 [281 P.2d 332] ; 12 Cal. Jur.2d, § 123, p. 334). Nor is identity of parties always necessary (*Peterson* v. *Miller Rubber Co. of New York* (8 C.C.A.), 24 F.2d 59, 62; *McCulloch* v. *Canadian Pac. Ry. Co.* (D.C.Minn.), 53 F.Supp. 534, 541; *MacDonald* v. *Wolff*, 40 Mo.App. 302, 309; *Schlein* v. *Gairoard*, 127 N.J.L. 358 [22 A.2d 539, 541] ). Here the main agreement was signed by all parties to the transaction; the brokerage agreement was signed by International and Berg Metals; it provided the manner of payment of the debt and was incorporated by reference into the guaranty contract notwithstanding the erroneous reference to an agreement of even date. We entertain no doubt that the two agreements "are to be taken together" pursuant to section 1642, Civil Code, which is a

restatement of the common law on the subject (*Cadigan* v. *American Trust Co., supra,* 131 Cal.App.2d 780, 787).

Over objection the court received parol evidence as an aid in the interpretation of the instruments. "When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties [citation], not to show that 'the parties meant something other *than* what they said' but to show 'what they meant *by* what they said' [citation]. Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution —including the object, nature and subject matter of the agreement [citation]—as well as to subsequent acts or declarations of the parties 'shedding light upon the question of their mutual intention at the time of contracting' [citation]." (*Barham* v. *Barham,* 33 Cal.2d 416, 422 [202 P.2d 289].) "Since the phrase is capable of two meanings, parol evidence is admissible to explain it. As this court stated in *Bartel* v. *Associated Dental Supply Co.,* 114 Cal.App.2d 750, 752 [251 P.2d 16] : 'Unless a court can "to a certainty and with sureness by a mere reading of the document, determine which is the correct interpretation . . . extrinsic evidence becomes admissible as an aid to interpretation. . . ." [Citation.]' " (*Associated Lathing etc. Co.* v. *Louis C. Dunn, Inc.,* 135 Cal.App.2d 40, 46 [286 P.2d 825].) We have here a perplexing problem of interpretation which could not have been determined satisfactorily from the face of the instruments alone. There was no error in the receiving of parol evidence.

Respondent's contention that this was a continuing guaranty upon which less than $15,000 was due at the time of suit, and that the guarantors were not released through the fact that the total of the fluctuating loan exceeded $15,000 at times, is well grounded. The giving of a note was abandoned because of the fluctuating nature of the debt. Indeed, the guaranty agreement refers in paragraph 3 to "any loss for any money or sums remaining unpaid pursuant *to the loans up to* Fifteen Thousand ($15,000.00) Dollars." (Emphasis added.) At the time the guaranty was made the indebtedness actually amounted to $16,783.43; appellants' contention would strangle the obligation of the guarantors at birth. There never was any intention that a single lump

sum loan should be made; while there is some evidence to the contrary the trial court, not without good reason, rejected it. Plaintiff's method of handling its own books does not affect the result for appellate purposes; it merely furnishes some evidence, the effect of which we do not weigh.

The loan was arranged to enable International more successfully to carry on business in the future. The indebtedness was intended to be the result of advances made by plaintiff against cars of scrap already shipped or about to be shipped. The loan was to be paid off through the application of one dollar a ton for each car of scrap. No interest was to be charged on the debt for it was a means of holding for plaintiff the exclusive brokerage agency for International, which agency was expressly declared to continue so long as the debt remained unpaid in any part. The applicable principles of law are well settled.

The question of whether a guaranty is a continuing one is to be determined by reference to all relevant surrounding circumstances. ''The Civil Code defines a continuing guaranty as one relating to a future liability of the principal under successive transactions which either continue his liability or from time to time renew it after it has been satisfied. Whether or not a guaranty is continuing must be determined from the language of the instrument, or, in case of ambiguity, by resort to parol evidence of the circumstances under which it was made. Where by the terms of the instrument it is evident that the object is to give a standing credit to the principal, to be used from time to time either indefinitely or for a certain period, it is deemed a continuing guaranty. And it has been stated that unless the words of the guaranty fairly imply that the guarantor's liability is to be limited, it will be regarded as continuing until the guaranty is revoked. . . .

''A guarantor may limit the amount for which he will be liable, or the time for which his guaranty will run, or may limit his liability to a single transaction between the principal debtor and the creditor, as distinguished from a continuing guaranty. However, a limitation on the amount for which the guarantor will be liable does not necessarily mean that the guaranty is not continuing. Such a limitation is not construed as a condition to the extent of credit to be given the debtor, breach of which would release the guarantor; and the guarantor may still be liable though

the principal debtor has at various times contracted and paid debts equal to or greater than the amount of the guaranty." (46 Cal.Jur.2d, § 14, pp. 207-209.)

*Goldman* v. *Dangerfield*, 101 Cal.App. 67 [281 P. 400], dealt with a guaranty reading: "We hereby guarantee payment for all merchandise purchased . . . up to the amount of Fifteen Hundred Dollars ($1,500.00)." (P. 68.) Holding this to be a continuing guaranty the court quoted from 28 Corpus Juris 961, as follows: " 'Where the guaranty contains a limitation as to the amount for which the guarantor will be bound, but contains no limitation as to time, and there is nothing in the circumstances surrounding the execution of the contract to evince a contrary intention, it will, in general, be construed to be a continuing guaranty and operative without limitation, except as to the amount of liability, until revoked. The limit mentioned in such a guaranty has reference to the amount of [the guarantor's liability, and not to the amount of] dealing between the principal and the guarantee, and the guarantor will be held liable to the extent of his guaranty, notwithstanding the principal debtor may have, during the existence of the contract, contracted debts to an amount equal to, or greater than, the sum named in the guaranty, and paid them. But where it is apparent, either from the language of the guaranty itself or from such language in connection with the circumstances, that the intention was to limit the guaranty to the amount specified for the first transaction, or series of transactions, it is not a continuing one and will not extend to other transactions after such limit has once been reached.' In the case at bar it is evident that there is nothing in the surrounding circumstances to show that the intention was to limit the guaranty to any particular transaction. It was simply a guaranty covering 'all merchandise purchased,' without any limitation as to time, and had no reference whatever to any initial stock of goods or any particular order for goods." (Pp. 72-73.) " 'A continuing guaranty contemplates a succession of liabilities for which, as they accrue, the guarantor becomes liable. It is prospective in its operation, and is generally intended to provide security in respect to future transactions, within certain limits.' . . . On the same page, citing a number of authorities, we find the following: 'Unless the words in which a guaranty is expressed, fairly imply that the liability of the guarantor is to be limited, it is generally regarded as continuing until the guaranty is revoked.' And further: 'While the courts differ as to what words constitute a continuing guaranty,

they seem to agree that if the contract is found to be a continuing guaranty, the payments by the principal do not discharge the guarantor unless they discharge the full debts to which the guaranty attaches.' '' (P. 75.)

In *Lean* v. *Geagan*, 20 Cal.App. 260, 262 [128 P. 792], the guaranty applied to ''any and all indebtedness which may hereafter become due from said W. B. Provan to said Hitchcock-Hill Company, provided the amount due or to become due shall at no time exceed the sum of one thousand dollars.'' (P. 261.) The court said, in part: ''We think the court was right in the first instance, and that the mere extension of credit to Provan beyond the sum named did not exonerate the obligor. . . .

''It is well settled that any ambiguity in a contract of guaranty, concerning the liability of the guarantor, will be resolved in favor of protecting the creditor to the extent of the sum named therein; in other words, that such a provision will be construed as a limitation upon the amount of the guarantor's liability rather than as a condition upon which any liability whatever attaches.

''In the present case we think the words 'provided that the amount due or to become due shall at no time exceed the sum of $1,000' refer to the liability to be assumed by the guarantor.'' (P. 262.)

To the same effect, see *Sinnige* v. *Oswald*, 170 Cal. 55, 59 [148 P. 203] ; *Bank of America* v. *Hunter*, 8 Cal.2d 592, 596 [67 P.2d 99] ; *Kierulff & Ravenscroft* v. *Koping*, 94 Cal.App. 473, 476 [271 P. 353] ; *Bank of America* v. *Sage*, 13 Cal.App.2d 171, 175 [56 P.2d 565] ; 57 A.L.R.2d 1209, 1211, anno.

The court correctly held that the guaranty at bar was a continuing one from which appellants had not been released and did not err in awarding judgment for the amount due at the time of suit, a sum less than the specified maximum of $15,000.

Appellants' second major claim is: ''The Indemnity Agreement was a guaranty of collectibility and since Berg failed to use reasonable diligence in collecting from the principal, the guarantors were released.'' It is doubtful whether this is a guaranty of collection, but we need not decide the question for, assuming that we deal with such an undertaking it appears that the guarantors, through estoppel (Code Civ. Proc., § 1962, subd. 3), waived any right to have the creditor pursue the principal debtor. In this, as in other aspects of the

case, we accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence. (*New* v. *New*, 148 Cal.App.2d 372, 383 [306 P.2d 987]; *Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].)

Beginning shortly after the six months prescribed by the contract plaintiff requested delivery of the second trust deed and chattel mortgage and notified the guarantors that International was then in default and they were personally liable under their guaranty. This was in July, 1950. Repeated requests for said liens or payment of the indebtedness followed. Appellants, acting through Mr. Olmstead, assured plaintiff and its attorney that the Wilson Estates would soon be closed and the agreed liens executed and delivered; he also impressed upon them the need of continuing advances to International to enable it to successfully carry on business; assured them that this would be safe because such advances were within the guaranty and the individual guarantors were then liable and were amply able to pay. Plaintiff, its officers and attorney believed these representations and relied thereon and continued to make such advances until November 30, 1951. When it demanded payment of its debt on December 17, 1951, the insolvency of International was revealed. This was followed by discontinuance of business on January 15, 1952, International having no assets with which to meet its obligations. Up to that time the guarantors' active efforts had prevailed upon plaintiff to refrain from taking advantage of the existing default and to continue making advances to International. They were thereby estopped to complain of any delay on plaintiff's part in endeavoring to enforce payment from the principal debtor.

The court found that after the discontinuance of International's business on January 15, 1952, Mr. Olmstead, acting for appellants Harry R. Wilson and Jeanette Reifsnyder as well as himself, requested plaintiff on several occasions to refrain from bringing suit against them upon the guaranty, representing that all defendants were attempting to reorganize International, to recapitalize it so that it could resume operations, and that as soon as these things were accomplished plaintiff would be paid the sum due it from International or, in lieu thereof, would receive upon closing of the Wilson Estates a second trust deed and second chattel mortgage. Plaintiff believed said statements and representations and relied on them and was induced thereby to refrain from filing

suit until November of 1953, at which time it learned that there was no possibility of rehabilitating International.

 The right to complain of delay in enforcing a guaranty of collection may be waived expressly or by conduct. Volume 38, Corpus Juris Secundum, section 64, page 1226: ''The acts or steps heretofore considered as being necessary on the part of the guarantee in order to fix liability on the guarantor, being intended for the benefit and protection of the guarantor, may be either expressly or impliedly waived by him; or he may be estopped by his conduct from taking advantage of the failure to perform such acts or take such steps. Thus the necessity for diligence in prosecuting a claim against the principal debtor may be waived by the guarantor, and this waiver may be by parol agreement.'' To the same effect, see *Bastian Bros. Co.* v. *Brown,* 293 Mich. 242 [291 N.W. 644, 647]; *Mead* v. *Parker,* 111 N.Y. 259 [18 N.E. 727, 729]; *Bogardus* v. *Phoenix Mfg. Co.,* 134 Ill.App. 456, 460. When insolvency intervened that put an end to any obligation to pursue the principal debtor. (Civ. Code, § 2801; *Irving* v. *Irwin,* 133 Cal.App. 374, 378-379 [24 P.2d 215].)

 At the time the contracts were made California Mill Supply Corporation, a corporation, was doing business under the fictitious firm name of Berg Metals Company, having complied with section 2466, Civil Code, by filing an appropriate certificate on October 31, 1947, and thereafter publishing same as required by the statute. On or about January 1, 1952, plaintiff Berg Metals Corporation became the corporate successor of California Mill Supply Corporation in the manner hereinafter detailed. Appellants say that plaintiff cannot maintain this action as assignee of California Mill Supply Corporation, because section 2468 Civil Code[1] forbids. The crux of the argument is that the certificate was not executed in

_____

[1]Civ. Code, § 2468: "The certificate filed with the clerk as provided in Section 2466 must be signed by the person therein referred to, or by the partners, as the case may be, and acknowledged before some officer, authorized to take the acknowledgment of conveyances of real property, by personally appearing before such officer, notwithstanding the provisions of Section 1195 of the Civil Code. . . . No person doing business under a fictitious name, or his assignee or assignees, nor any persons doing business as partners contrary to the provision of this article, or their assignee or assignees, shall maintain any action upon or on account of any contract or contracts made, or transactions had, under such fictitious name, or in their partnership name, in any court of this State until the certificate has been filed and the publication has been made as herein required."

the manner required by section 2466, Civil Code, which at the time of filing the certificate provided: "Except as otherwise provided in the next section every person transacting business in this state under a fictitious name and every partnership transacting business in this state under a fictitious name, or a designation not showing the names of the persons interested as partners in such business, must file with the clerk of the county in which his or its principal place of business is situated, a certificate stating the name in full and the place of residence of such person and stating the names in full of all the members of such partnership and their places of residence."

The certificate in question states that California Mill Supply Corporation is conducting business at 2652 East Long Beach Avenue, in the city of Los Angeles, under the fictitious firm name of Berg Metals Company; it then names the president and secretary of the California Mill Supply Corporation and gives the residence address of each. ■ The purpose of the section with respect to a partnership is thus stated in *Andrews* v. *Glick*, 205 Cal. 699, 701 [272 P. 587]: "The object of section 2466, *supra*, is that public notice shall be given and a public record made of the individual members of partnerships with such definiteness and particularity that those dealing with them may at all times know who are the individuals with whom they are dealing or to whom they are giving credit or becoming bound." ■ Speaking of an individual doing business under a fictitious name the opinion in *Ray* v. *American Photo Player Co.*, 46 Cal.App. 311, 314 [189 P. 130], says: "The purpose of these provisions is to prevent fraudulent trading."

■ It is generally recognized that the statute applies to a corporation which is doing business under a fictitious name. ■ To bring a corporation within the statute it must be held to be a person (Civ. Code, § 14), surely not a partnership. ■ Manifestly, the full purpose of the statute was subserved by the certificate in question. It discloses the name of the "person" doing business under a fictitious name, gives its business address, names its president and secretary and gives their respective residence addresses. One who would know in advance the person who is to become responsible to him, or who would sue after a breach of contract, has before him all the data he can possibly use. No concealment, nothing misleading, is found in the certificate, which obviously was an adaptation to a corporation of a statutory provision relating to a

natural individual. A corporation has no residence except its place of business and that is stated in the certificate. Substantial compliance with the statute is all that is required (*Bank & Trust Co.* v. *Gearhart*, 45 Cal.App. 421, 423 [187 P. 989]), and the trial judge was correct in so holding.

It is further argued by appellants that the cause of action belonged to California Mill Supply Corporation, doing business, as Berg Metals Company, and that no assignment in favor of the Berg Metals Corporation was proved, hence plaintiffs has no standing to maintain the suit. The evidence shows that this asset vested in plaintiff by virtue of a reorganization of California Mill Supply Corporation.

That company had three separate divisions, one of them known as Berg Metals Company, each division operating a separate business and keeping separate accounts. The plan of reorganization called for the formation of three separate corporations, one of which is plaintiff Berg Metals Corporation, and the transfer to each of them of all assets pertaining to the division which preceded it,—in this case Berg Metals Company. The opening balance sheet of plaintiff showed net assets of $1,764,474.29 transferred to it, which item included cash on hand, accounts receivable, advances to dealers, notes receivable, inventories and fixed assets. Stock of plaintiff corporation was issued to shareholders of California Mill Supply Corporation in proportion to their holdings in that former corporation; 17,424 shares were issued to California Mill Supply Corporation itself, and the consideration therefor was the transfer to plaintiff of the assets of the Berg Metals Company division. Plaintiff corporation continued in every respect the activities of Berg Metals Company except for the adoption of the new name. Such is the effect of the oral evidence. Supporting corporate records of California Mill Supply Corporation were received in evidence and a stipulation was made that same be marked plaintiff's Exhibit 13 for identification and withdrawn from the files. They are not before this court. In this state of the record we cannot say that the proof of assignment of the guaranty contract and the receivables was insufficient.

Moreover, we recognize it to be California law that an oral assignment of a contract or chose in action is sufficient. (*Swing* v. *Lingo*, 129 Cal.App. 518, 523 [19 P.2d 56]; *Ralph* v. *Anderson*, 187 Cal. 45, 47 [200 P. 940]; *Hagge* v. *Drew*, 73 Cal.App.2d 739, 745 [167 P.2d 263]; *Todd* v.

*Temple Hospital Assn., Inc.,* 96 Cal.App. 42, 46 [273 P. 595] ; 5 Cal.Jur.2d, § 35, p. 310.)

The judgment is affirmed.

Fox, P. J., and Herndon, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 15, 1959.