[Civ. No. 9362. Fourth Dist., Div. One. Nov. 7, 1969.]

BANK OF SANTA ANA, Plaintiff and Respondent, v.
JULIUS C. MOLINA, Defendant and Appellant.

610

## Counsel

James A. Withers for Defendant and Appellant.

Duryea, Carpenter & Barnes and Stewart L. Johnson for Plaintiff and Respondent.

## Opinion

**WHELAN, J.**—Julius C. Molina (defendant) appeals from a judgment on verdict finding him liable to Bank of Santa Ana (Bank), plaintiff, in the sum of $14,103.85 on a continuing guaranty of the obligations of Cal-Terrain, Inc., a corporation.

### The Matters Put in Issue by the Answer

Defendant's answer denied the execution, authenticity and delivery of the continuing guaranty purporting to bear his signature; denied all indebtedness to Bank; and denied a general allegation of the complaint that Bank had performed all the conditions, covenants and promises on its part to be performed under the contract of guaranty.

### Evidence in Support of the Judgment

Cal-Terrain, Inc. (Cal-Terrain) applied for a loan of credit with Bank in September 1962. The individuals who represented Cal-Terrain in its dealings with Bank were the brothers Wilsey: I. P. (Woody), Ernest (Ernest), and Ward (Ward), who were engaged jointly in the construction and land-development business. They were asked to furnish continuing guaranties, of which four printed forms were filled out at Bank's office with the name of Cal-Terrain as debtor, the amount of $12,500 as the limit of the guaranty and the date "September 12, 1962." Each of the Wilsey brothers signed a separate one of the forms, of which three were carbon copies, except as to the matter inserted.

All four of the forms were returned to Bank, the fourth bearing the signature of defendant.

The former blank spaces were now filled in with the name of the principal debtor, the amount guaranteed, the date (September 12, 1962), and the signature of the guarantor. It was captioned in extra bold-face 16-point type, "General Continuing Guaranty." The body, while in lighter, small pica type, was well-spaced and easily legible.[1]

---

[1] It contained, among others, the following provisions: "In consideration of any loans or advances by BANK OF SANTA ANA to Debtor CAL-TERRAIN, INC. for

Bank was furnished also with a carbon copy of a financial statement as of June 30, 1962, made by defendant that he had given to Woody, and made an inquiry of defendant's bank reference, First National Bank of Long Beach.

Bank then made a loan of $12,500 to Cal.-Terrain and took its note in that amount dated September 12, 1962, payable November 12, 1962. On November 28, $4,000 had been paid on the note, which on that date was replaced by a note for $8,500. Thereafter there were reductions in principal, and new notes given to evidence the balance from time to time until, on August 13, 1964, the note account balance was $2,500, represented by a note payable January 12, 1965. On October 26, 1964, an additional loan of $4,500 was made, represented by a second note in that amount. Those two notes were not reduced but were finally replaced by renewal notes in the same amounts dated May 3, 1965.

On July 21, 1965, Cal-Terrain executed a third note for an additional

---

the forbearance of Bank to sue upon any of the past due debt of Debtor and for other valuable consideration, the undersigned jointly and severally guarantee unto Bank, its successors and assigns, the prompt payment of any and all indebtedness according to the terms thereof, which Debtor may now or at any time hereafter owe to Bank to the extent of, and not exceeding at any one time, the principal sum of TWELVE THOUSAND FIVE HUNDRED AND NO/100 - - - - - - Dollars ($12,500.00), together with interest thereon and costs of collection thereof, including reasonable attorneys' fees.

Bank is hereby given full power to make advances beyond the extent above mentioned and to make, change, alter, cancel, renew, extend, decrease or increase the amount of principal or interest of such indebtedness of or contracts with said Debtor, as it and the Debtor may expressly or impliedly agree upon, or change, substitute, withdraw, decrease, increase, or otherwise alter any collaterals or property securing such indebtedness or contracts or any part thereof, and otherwise to deal with said Debtor or any endorser or co-guarantor as it may elect, without in any way diminishing, releasing or discharging the liability hereunder of the undersigned. Such liability shall be continuing and shall only be affected by the payment to Bank of the full amount of all indebtedness which may now or at any time hereafter be owing from said Debtor to Bank; provided that no payments made by or on behalf of the undersigned to Bank shall be held to discharge or diminish the continuing liability of the undersigned hereunder, unless and until written notice is given to Bank that such payments are at the time thereof being made for the purpose of liquidating such liability. The liability of the undersigned is not in consideration of or contingent upon the liability of any other person hereunder or under any similar instrument, and the release or death of or cancellation by any of the undersigned or any signer of a similar instrument shall not act to release or otherwise affect the continuing liability of any other signer hereof.

Notice of acceptance of this guaranty as well as all demands, presentments, notices of protest and notices of every kind or nature, including those of any action or non-action on the part of the Debtor, Bank, or anyone else, are hereby fully waived by the undersigned. Upon any default of the Debtor, Bank may, at its option, proceed directly and at once, without notice, against the undersigned to collect and recover the full amount of the liability hereunder, or any portion thereof, without proceeding against the Debtor or any other person. . . ."

amount of $4,851.43. That represented the balance of an overdraft for which credit had been allowed by Bank.[2]

The amount of those three notes, totaling $11,851.43, plus interest and attorney's fees, was sought to be recovered by Bank.

The authenticity of defendant's signature on the guaranty was testified to by an expert in the field, although controverted.

There was testimony that Bank had the guaranty in its possession before it made the loan and had satisfied itself that the signatures on the guaranty and the financial statement were by the same hand.

Defendant's relationship with the Wilsey brothers dated from a time four or five months prior to March 20, 1962, when he first met Woody at the Gyro Club in Long Beach. After seeing Woody socially in that setting over a period of four or five months and presumably meeting the two other Wilsey brothers, Ernest and Ward, defendant was asked by the brothers if he would invest in the construction business. Defendant did invest $850 on March 20, 1962. Woody stated he and his brothers were going to form a construction corporation and needed the money for that purpose. The corporation was formed and named Cal-Terrain, Inc. At some later time, but before the date of the guaranty, Woody requested a financial statement from defendant which, in defendant's words, was "to give the company some dignity, and so they would be able to make loans and so forth and proceed with optioning lands and things like that to build on."

Concerning Woody in the early days of their relationship, Defendant Molina said "he had such big ideas, I didn't know whether to believe him or not. It's just that I thought, well, I will go along with this and see what it's leading up to."

One of the exhibits in evidence, a credit memorandum dated October 2, 1962, covering Cal-Terrain and prepared by Bank, contains a statement that in August 1962 defendant had signed as a guarantor in the amount of $20,000 for a pharmaceutical company. Another credit memorandum, bearing the date of September 12, 1962, describes defendant as a vice president of Cal-Terrain.

Defendant did not receive any share certificate, but testified he was told stock in Cal-Terrain was being held for him by a lawyer.

He later guaranteed a note of $5,000 given by one of the brothers, on which he suffered no loss.

On February 25, 1963, he lent $5,000 to Eagle Enterprises, Inc.

[2]A notation in Bank's records speaks of a "long standing overdraft." Under section 858, Financial Code, it might have existed for as long as three months.

(Eagle), which was a corporation formed by the brothers, to be repaid by May 25, 1963; but on May 1 he agreed to invest $10,000 in a building project of Eagle, which it may be inferred included the $5,000 previously lent.

·Defendant, as an accommodation, co-signed the note of Woody to First National City Bank of Long Beach for $5,000 on which defendant suffered no loss.

At some time during defendant's dealings with the Wilsey brothers, defendant's brother, through him, invested $1,500 with the Wilseys for which he received no return.

On May 8, 1964, defendant received $3,836.60 as a return nominally from Cal-Terrain and had earlier received other sums that brought the total to over $4,000.

On September 17, 1965, Bank, by letter, made demand on defendant for $12,090.29 under the continuing guaranty, representing the three notes plus interest of $238.86. He turned the letter over to an attorney.

### TESTIMONY INCONSISTENT WITH THE FOREGOING

A handwriting expert gave his opinion contrary to that of Bank's expert, as to the authenticity of defendant's signature on the continuing guaranty.

The defendant testified that he did not see the form of continuing guaranty that bore his purported signature on September 12, 1962, or on any date thereafter or at any time when it did not contain the signature.

### CONTENTIONS ON APPEAL

We have stated the issues drawn by the answer. We note that the answer was prepared by counsel other than trial counsel.

In the joint pretrial statement and in a separate pretrial statement of defendant, prepared by trial counsel who is also defendant's appellate counsel, his contentions were stated to be:

That the signature appearing on the general continuing guaranty is a forgery and not that of defendant.

That no sums were lent by Bank to Cal-Terrain, pursuant to said general continuing guaranty.

That defendant is not indebted to Bank in any amount whatsoever by reason of said general continuing guaranty.

That if the continuing guaranty was signed by him, it was not signed with his knowledge or consent, but his signature was procured by fraud, trick

and design, and that if it was delivered to Bank it was not delivered by defendant or anyone acting as his agent or servant, either ostensible or actual.

The verdict of the jury found adversely to those contentions and to defendant on those issues.

As to those issues and those contentions, defendant on appeal challenges the sufficiency of the evidence to support the verdict.

He also asserts error of the trial court in the following particulars: The court usurped the function of the jury and effectively precluded the jury from determining that a lesser sum was due; the court, by a remark within the hearing of the jury, incorrectly stated the law on two material issues to the prejudice of defendant; the admission of defendant's financial statement into evidence was prejudicial error; the special interrogatory given at the conclusion of the instructions effectively raised only one issue to be decided by the jury.

Finally, defendant seeks to assert two new issues not discussed by the pleadings or the pretrial statements, and not brought to the attention of the court during trial. He states those issues in the following language: Bank breached its duty of disclosure toward Molina as surety and discharged him thereby; negligence of Bank in its handling of loan is a defense and will discharge surety.

### SUFFICIENCY OF THE EVIDENCE

We have recited the evidence, including that reasonably to be inferred from the testimony and documents, in support of the verdict. A detailed analysis of it is not required. It is sufficient to support the verdict on every point as to which the sufficiency is challenged.

Concerning the authenticity of the signature, the jury may have noted, as we have, that defendant did not testify that he had not signed the document or that the signature was not his. An understandable lapse of memory concerning the circumstances of signing and the nature of the document could not deprive it of its legal meaning.

On the question of delivery, the authenticity of the signature having been found by the verdict, and the defendant having furnished a financial statement that was presented to Bank for the ostensible purpose of enabling Cal-Terrain to obtain credit, it might reasonably be inferred that the officers of Cal-Terrain, for whose benefit defendant had furnished the financial statement, and to whom Bank gave the forms of guaranty for the purpose of having them executed and who returned the signed guaranties to Bank, had obtained defendant's signature to the guaranty for the purpose of delivery to Bank.

*Miller* v. *Jansen,* 21 Cal.2d 473, 477 [132 P.2d 801], declares: "[P]ossession by the grantee gives rise to an inference that the instrument was duly delivered" and cites numerous cases in support of the rule. Such an inference is permissible not only as to deeds but as to any written contract whose effectiveness is conditioned upon delivery.

*O'Neill* v. *O'Malley,* 75 Cal.App.2d 821, 827 [171 P.2d 907], states that possession is "prima facie evidence" of delivery.

The permissible inference declared by *Miller* v. *Jansen, supra,* is enough to support the finding. (See also *Butler* v. *Woodburn,* 19 Cal.2d 420, 425 [122 P.2d 17]; 1 Wigmore (3d ed.) § 157, p. 603.)

It is of no consequence, therefore, that direct delivery to Bank was not made personally by defendant, which seems to be the basis of his claim of non-delivery.

In *Pacific Mill & Timber Co.* v. *Massachusetts Bonding & Ins. Co.,* 192 Cal. 278 [219 P. 972], the surety signed the bond and delivered it to an officer of the principal with instructions to obtain its signature. Instead, the bond was delivered to the obligee without the signature of the principal. As to claims of non-delivery and of consensual defect, the court said: " 'The bond was one, therefore, which was good without the signature of the principal.

" 'Such being the case, when the bond was delivered to the obligee without the principal's signature, the obligee did not have constructive notice of any condition attached to its execution by the surety. The natural inference which the obligee would draw under the circumstances would be that the principal's signature was omitted because it was not necessary. Holding as we do on this point, it is unnecessary to consider the assignments of error to the admission of evidence of the intentions of the surety as it is conceded that none of these matters were communicated to the appellant.' (P. 284)

"*.* . . . . . . . . . . . . . . . . .

"There is nothing upon the face of the bond, it being joint and several (*Kurtz* v. *Forquer* [94 Cal. 91 (29 P. 413)], *supra*), or in the transaction itself which imposed upon the obligee the duty of inquiring of the surety company whether any conditions had been imposed upon the McKenzie Company before delivery made." (P. 289)

### Contentions Made for the First Time on Appeal

We discuss later defendant's argument that he was precluded from presenting evidence as to Bank's failure of duty to disclose to defendant that Cal-Terrain's notes were not paid off when due but were renewed, that

after the first loan had been reduced in amount additonal sums were lent, and that one of the notes sued upon was for an overdraft.

The matter of the renewals of the notes is also cited as negligence on the part of the Bank that should release defendant from liability.

Defendant states Bank owed these obligations to the guarantor: ". . . an affirmative duty to disclose at the outset to Molina that his continuing guaranty had been received by it, or some other communication to establish his intent to be a surety particularly as they were complete strangers to each other.

". . . [An] affirmative duty to disclose to Molina that original obligation which was for a limited purpose and for only sixty days, was not repaid and extensions were requested.

"Bank should have notified Molina that obligation was paid down and was again being renewed.

"Bad checks for $4,800 some odd dollars should not have been permitted to be honored at the surety's expense without his express consent."

■ Since there was nothing to put Bank on notice that defendant would claim he had neither signed nor delivered the guaranty, it did not have any obligation to inform him it had received the guaranty. (*Pacific Mill & Timber Co.* v. *Massachusetts Bonding & Ins. Co., supra,* 192 Cal. 278.) In the case last cited, as in the case at bench, there was no direct, personal contact by the surety with the creditor. Notice of acceptance of the guaranty was by its terms expressly waived in the case at bench.

■ The record is devoid of any evidence that Bank had notice of any claim that the continuing guaranty applied only to the original loan. The language of the instrument is not so limited, but evidences a contrary intent.

In the absence of anything putting it upon notice that the surety requested such information, the latter's obligation is not affected by the fact he was not informed that the original obligation had been reduced, that it was being renewed, and that new loans were being made. (*Bank of America etc. Assn.* v. *Wren,* 6 Cal.App.2d 317, 318, 319 [43 P.2d 830]; *Berg Metals Corp.* v. *Wilson,* 170 Cal.App.2d 559, 569, 570 [339 P.2d 869].)

■ The evidence is that the overdraft was the result of a credit arrangement with Bank. ■ " '[A]n overdraft by a bank amounts to a loan to the depositor.' " (*Bromberg* v. *Bank of America,* 58 Cal.App.2d 1, 6 [135 P.2d 689].) ■ The language of the guaranty would cover an overdraft incurred as a customary banking practice. The overdraft was

consideration for the note subsequently given for the amount of the overdraft. (*Popp* v. *Exchange Bank,* 189 Cal. 296, 300 [208 P. 113].) While the guaranty does not in express language mention an overdraft as was the case in *Bank of America etc. Assn.* v. *Kelsey,* 6 Cal.App.2d 346, 348 [44 P.2d 617], we cannot say as a matter of law that a continuing guaranty in the language of that under consideration does not cover a loan arising from an overdraft that had been authorized by the creditor. We expressly do not hold that information as to the existence of an overdraft over a considerable period of time is not information that a bank has a duty to communicate to a continuing guarantor, should the bank have reason to believe the overdraft materially increased the risk beyond that which the surety intended to assume. Very clearly a more cogent reason for communication by the creditor to the guarantor would exist in the case of an overdraft that had not been authorized by the bank.

Considerable reliance has been placed upon *Sumitomo Bank of Cal.* v. *Iwasaki,* 70 Cal.2d 81 [73 Cal.Rptr. 564, 447 P.2d 965], as supporting defendant's position.

Under the *Sumitomo Bank* rules, at the time of extending new credit no duty to disclose arises unless the following conditions are present: "(a) 'the creditor has reason to believe' that those facts materially increase the risk 'beyond that which the surety intends to assume'; (b) the creditor 'has reason to believe that the facts are unknown to the surety'; and (c) the creditor 'has a reasonable opportunity to communicate' the facts to the surety."

In the *Sumitomo Bank* case, part of the evidence was that Iwasaki, the defendant, had first introduced the borrowers to the plaintiff to obtain a loan; when the borrowers needed additional funds, although still indebted for more than half of the original loan, Iwasaki signed the continuing guaranty. The failure of the bank to inform Iwasaki that the borrowers had misappropriated federal withholding tax was the basis of the trial court's finding the bank was culpably negligent in failing to communicate that information to Iwasaki.

Although the trial court rejected the defense, Iwasaki's answer had alleged that he had understood the guaranty extended only to one specific loan of $5,000 and not as a continuing guaranty. It alleged also that the bank, without knowledge or consent of Iwasaki, had made the additional loan.[3]

In *Sumitomo Bank,* although Iwasaki did "not plead breach of duty of

---

[3]Some of the facts stated appear in the superseded opinion of the Court of Appeal filed on April 3, 1968, and found in 67 Cal.Rptr. 508.

disclosure as an affirmative defense to liability on the third loan," the parties and the trial judge proceeded on that theory throughout the trial.

■ If it be considered in the case at bench that the issue of Bank's negligence or failure of duty was before the trial court, then, under the holding of the Supreme Court in *Sumitomo Bank,* the defendant here failed to show by a preponderance that the facts known to Bank and unknown to defendant materially increased the risk beyond that which the creditor had reason to believe the surety intended to assume. The only testimony on the part of defendant on the subject is that he did not intend to assume any risk. That claim was rejected by the verdict; so that there remains only the evidence showing Bank received a general continuing guaranty not limited to a specific loan, containing language that permitted renewals and additional loans, furnished and solicited by the debtor, and signed by one who, according to information in Bank's files was a vice president of the debtor.

It was not shown that Bank had reason to believe the extension of credit by way of an overdraft was unknown to defendant. This is not to say that defendant knew of the overdraft, but only to point out the absence of anything in the record to suggest Bank had reason to believe the fact was unknown to defendant.

But, says defendant through counsel, it could not have been known at the time of trial or at the time the issues were formally drawn that a defense based on negligence or breach of a duty to disclose on the part of the creditor afforded a defense, and that it was necessary to plead it affirmatively and produce affirmative evidence to support it, because the *Sumitomo Bank* case, which first defined the rules, was not finally decided until December 24, 1968.

The *Sumitomo Bank* decision for the first time laid down the rules as to the conditions under which a creditor owes a duty of disclosure to a surety on a continuing guaranty during the course, as well as at the inception, of the suretyship relationship. The trial court, in *Sumitomo Bank,* had relied upon the Restatement rule formally adopted by the Supreme Court as the law of California.

■ We note that defendant in the case at bench requested the following jury instruction: "After execution of a contract of suretyship, it is the creditor's duty to act in the utmost good faith toward the guarantor and to protect the guarantor's interest so far as he can do so consistently with his own rights. Collusion between creditor and principal whereby the guarantor's liability to the creditor is increased discharges the surety."

"*Ely* v. *Liscomb,* 24 Cal.App.224 [140 P. 1086].

"*Passow & Sons* v. *United States Fid. & Guar. Co.,* 177 Cal. 31 [170 P. 1124]."

The instruction was refused. No claim of error has been assigned for such refusal. Clearly it was proper to refuse it. The issue of a breach of duty had not been presented; and no evidence on the issue had been developed; in such case an instruction on such an issue is properly refused. (*House Grain Co.* v. *Finerman & Sons,* 116 Cal.App.2d 485, 495 [253 P.2d 1034].) The instruction as presented could be taken to mean that only collusion between creditor and debtor constituted a breach of the creditor's duty; and further that the jury might find from the evidence there was collusion. No evidence in the record could support such a finding. Since the instruction in the form submitted was improper and could not be given without modification, the court might properly refuse it. (*Estate of Dopkins,* 34 Cal.2d 568, 575 [212 P.2d 886]; *Nelson* v. *Southern Pac. Co.,* 8 Cal.2d 648, 653 [67 P.2d 682].)

We mention the instruction because it and the authorities it cites recognize a duty of the creditor to the surety that continues after the creation of the relationship, and because the requesting of the instruction suggests such an awareness on the part of counsel.

 It is argued the defense was before the court because the answer denied an allegation of the complaint that Bank had performed everything on its part to be performed.

In *Eucalyptus Growers Assn.* v. *Orange County Nursery & Land Co.,* 174 Cal. 330, 335 [163 P. 45], the court declared: "These propositions do not aid the defendants as the case now stands. Assuming them to be sound in law, which we need not decide, they fall within the category of excuses for nonperformance, and they are excuses not apparent on the face of the contract, nor embraced within the facts alleged in the complaint. They are, therefore, matters of defense, and to be available to the defendants they must be set up in the answer. The answers contain no allegations of the facts necessary to support either of these propositions. It follows that they cannot be advanced in support of this appeal. . . ."

The published opinion in *Eucalyptus Growers Assn.* v. *Orange County Nursery & Land Co., supra,* 174 Cal. 330, does not disclose that the complaint therein contained general allegations of performance. However, the Supreme Court, in *California etc. Assn.* v. *Rindge Land & Nav. Co.,* 199 Cal. 168, 179 [248 P. 658, 47 A.L.R. 904], states: "In *Eucalyptus G. Assn.* v. *Orange County Nursery & Land Co.,* 174 Cal. 330 [163 P. 45], the complaint alleged 'that the said plaintiff has generally and specifically complied with and performed each and all the conditions on its part to be performed and contained in said written agreement.' "

It is clear from those two authorities that defendant's denial of the general allegation of plaintiff's complaint does not create a basis for proof of affirmative defenses not otherwise pleaded.

To the same effect is *Standard Oil Co. v. Houser,* 101 Cal.App.2d 480, 488 [225 P.2d 539], where the court said: "Defendant admitted the execution of the guaranty in the terms pleaded in the complaint. He did not plead any limitation, condition precedent, exoneration, or any similar defense. Such matters are affirmative defenses and are not available unless pleaded. (Code Civ. Proc., sec. 437; *Blackwood v. McCallum,* 187 Cal. 655, 659 [203 P. 758]; *Pacific Mill & Timber Co. v. Massachusetts Bonding & Ins. Co.,* 192 Cal. 278, 285 [219 P. 972]; *Hobson v. Metropolitan Cas. Ins. Co.,* 120 Cal.App. 727, 730 [8 P.2d 150].)"

Defendant for the first time contended in oral argument he was precluded by the trial court from introducing evidence on the issue. The cited support for that statement is in the following sequence from the record: "Q. [I]sn't it true that as of the time you left the bank, the sixty-day note that was executed by the Wilseys of Cal-Terrain was renewed constantly until the time you left? "A. I believe the records show there was reductions. "Q. And the reductions were from other borrowings? "A. No sir. "Q. They weren't? Do you have any records to verify that statement? "A. I believe they were reduced out of their own funds. "Q. Are you saying that the loans were made to pay, reduce this one? "THE COURT: Well, Counsel, I don't believe that is material. The bank isn't on trial for good banking practices. Maybe they shouldn't have renewed them so many times, but that is no defense. "WITNESS: Sometimes we are forced to renew."

Thereafter, counsel continued his cross-examination of the witness until the following occurred: "Q. Then you didn't rely upon his guaranty, did you, in renewing those notes time after time after time? "MR. JOHNSON: Your Honor, I object, it's immaterial. "THE COURT: Well, I am afraid it is. I don't believe that is a defense you are asserting, Counsel, estoppel or anything like that, laches. "MR. WITHERS: No, I am attacking the credibility of the witness and of the plaintiff, that they ever in fact knew they had the guaranty. "THE COURT: You are going into this to give rise to the possible inference that they never even had it? "MR. WITHERS: Right. "THE COURT: "Okay, if that is the purpose of it."

In the face of that record it cannot be said, as was said in the *Sumitomo Bank* decision, that the parties and the trial judge proceeded throughout the trial on the theory a defense of nondisclosure was before the court. Nor can it be said defendant attempted to present the defense but was prevented from doing so by the court.

There are difficulties that are inherent in attempting to present the

theories on which defendant actually relied in trial, and at the same time claiming a defense of nondisclosure within the rules defined in the *Sumitomo Bank* case.

We do not say the difficulties are insurmountable. That they exist can be seen from an analysis of the following statement found in defendant's brief: "The first obvious requirement of good faith in this case was to make at least casual inquiry of him at the very outset to determine if he was in fact intending to deal with them." That statement assumes the truth of defendant's theory that he either did not execute the guaranty or was unaware that he had done so; on that theory he would have been first awakened to the fact it was claimed he had executed such an instrument and that it was in Bank's possession when he received the demand in 1965.

But if that theory is discarded, it can make little difference that Bank did not communicate directly with defendant in the first instance.

It was of the essence of the theory at trial that defendant did not know of the existence of the purported guaranty, and had never personally communicated with or had communication from Bank.

It is of the essence of the Restatement defense that Bank have reason to know that certain risks were not within the contemplation of the guarantor, and have reason to believe that information possessed by Bank was unknown to the guarantor and that such information concerned activity of the debtor that might materially increase those risks.

Since Bank had had no information that defendant would deny that he had executed the guaranty, no source of information as to what risks he contemplated was shown except the contents of the guaranty itself.

## WHETHER THE VERDICT WITHIN THE ISSUES COULD HAVE BEEN FOR A LESSER AMOUNT

The jury first returned a verdict for $14,103.85. When polled, however, only eight members responded affirmatively. The foreman informed the court that the count in the jury room had been nine to three; later he stated there seemed to have been some question as to a different amount if they did not agree to the full amount of $14,000; and he asked whether, in the discretion of the jury, there could be any deviation from the full amount prayed for. It was then the court said: "Well, I don't see how there could be unless you might question the attorney's fees, that would be the only thing, and I doubt if you would question the attorney's fees because the amount requested is quite modest, as you can see."

We find no error in the court's statement. The award of a lesser amount than established by the evidence would not have been within the jury's

discretion. There was no issue as to whether payment had reduced the amount prayed for.

### DID THE COURT MAKE AN ERRONEOUS STATEMENT OF LAW TO THE JURY?

Defendant has seized upon the following remark of the trial judge as error: "Maybe I can shorten it. I think your prima facie case would be just to offer the notes that are presently unpaid and show the balance and offer the guaranty if you have it, and that will be prima facie, and then the burden will shift to show the forgery or lack of delivery. "MR. JOHNSON: Very well, Your Honor."

It cannot be said that a statement subject to explanation of the difference between the burden of proof and the burden of proceeding with the production of evidence must have prejudiced the jury at that stage of the proceedings, when later the jury was fully instructed as to which party had the burden of proof on the issues of due execution, delivery and consideration, and evidence on those subjects was in fact given by Bank as a part of its case in chief.

Defendant at the time took no exception to the court's remark and made no request to have the trial judge explain more fully the law on the subject.

Another remark of the court as to the burden of proof is excepted to now for the first time. Such an objection or request must have been made in the trial court before the matter may be urged on appeal. (*Estate of Golden,* 4 Cal.2d 300, 310-311 [48 P.2d 962].)

At another point, the court queried whether there was a presumption of genuineness of the signature. No answer to that question was given, but almost immediately thereafter the court stated: "[T]here will have to be some evidence, I am sure, that being one of the issues in the case, so I will sustain the objection pending some proof of the signature."

But if counsel felt the jury might get a wrong impression of the law, he again voiced no objection.

### WAS IT ERROR TO ADMIT INTO EVIDENCE DEFENDANT'S FINANCIAL STATEMENT?

The financial statement was offered and admitted without objection. After having voiced objection, counsel stated: "I withdraw the objection. I really do care. Let's put it in, put it on the table, I don't care." Before defendant withdrew his objection, the court volunteered that the

jury could be instructed to disregard what the financial statements showed as to defendant's assets.

The fact that defendant furnished a financial statement in more than one copy to Woody, for some purpose, one copy of which was given to Bank, followed shortly by a form of continuing guaranty purportedly signed by defendant, was a circumstance bearing upon the question of due delivery of the guaranty, as was the content of the financial statement, since it showed a financial worth consistent with the furnishing of the guaranty.

There was no error in the premises.

### WAS IT ERROR FOR THE COURT TO SUBMIT THE SPECIAL INTERROGATORY?

 A special interrogatory was submitted as to whether the signature on the guaranty was genuine or forged.

It is argued that as a result of having the interrogatory submitted to it the jury must have considered that the only issue was the authenticity of the signature.

The jury was instructed that Bank had the burden of proving due execution of the guaranty; that the guaranty was delivered to Bank; and that the continuing guaranty was supported by consideration. There was an instruction that delivery is the physical transfer of an instrument with the intent of the signer thereof to be bound by it.

Defendant asserts there was no legitimate purpose in submitting the interrogatory. However, it would have been useful in the event of a verdict adverse to plaintiff to know whether the jury found in defendant's favor on the only issue as to which there was a conflict in the direct evidence. "It is the Court's province to determine as to what particular facts the jury shall find specially, and neither party has the right to dictate the terms of any particular question to the jury, and for refusing to comply with such a request no error can properly be assigned." (*American Co.* v. *Bradford,* 27 Cal. 360, 365.) It is still the law that those matters are within the court's discretion. (*House Grain Co.* v. *Finerman & Sons, supra,* 116 Cal.App.2d 485, 498 [253 P.2d 1034]; *Estate of Witt,* 198 Cal. 407, 426 [245 P. 197].) No abuse of that discretion has been shown. The record fails to show, also, that defendant objected in the trial court to the submission of the special interrogatory. (See *Napa Valley Packing Co.* v. *San Francisco etc. Funds,* 16 Cal.App. 461, 469 [118 P. 469].) Had defendant desired special interrogatories on other issues of fact, he might have requested them; and perhaps they would have been given.

CONCLUSION

The record shows that even during the trial an opportunity presented itself for asserting a defense based upon what had occurred after the delivery of the guaranty and the making of the original loan.

In such a situation, the failure to assert the defense in the trial court precludes the assertion on appeal of a claim of error based upon such defense. (*Fruitvale Canning Co.* v. *Cotton,* 115 Cal.App.2d 622, 627 [252 P.2d 953].)

No grounds have been shown for reversing the judgment or for remanding the case for retrial.

The judgment is affirmed. Plaintiff is awarded and shall recover from defendant attorneys' fees for this appeal in the sum of $650.

Brown (Gerald), P. J., and Coughlin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 14, 1970.