In re SUNRISE R.V. INC., Debtor.

Bankruptcy No. 288–8309–B–7. Motion No. HSM–4.

United States Bankruptcy Court, E.D. California.

Oct. 24, 1989.

See also, Bkrtcy., 105 B.R. 587.

Hefner, Stark & Marois by Howard S. Nevins, Sacramento, Cal., for moving party and secured creditor ITT Commercial Finance Corp.

Boyden, Cooluris, Hauser & Saxe by Gregory J. Hughes, Sacramento, Cal., for secured creditor Gen. Elec. Capital Corp.

Langlois, MacDonald & Webster by Kimber B. Goddard, Sacramento, Cal., for John and Alice Carr, creditors.

Paris & Paris by Jeffrey A. Paris, Santa Monica, Cal., for Yegen Associates, Inc.

Kenneth R. Smith, Fair Oaks, Cal., for debtor Sunrise R.V., Inc.

## MEMORANDUM OF DECISION

DAVID E. RUSSELL, Bankruptcy Judge.

### FACTS

The relevant facts surrounding this controversy are as follows: Sunrise R.V., Inc. (hereinafter "SUNRISE") was heretofore engaged in the business of selling new and used recreational vehicles at 11335 Folsom Boulevard in Ranch Cordova, California. On May 16, 1986 General Electric Credit Corporation, predecessor to General Electric Capital Corporation (hereinafter "GECC") filed a financing statement with the Office of the California Secretary of State which purported to cover, inter alia,

> "all inventory ... whether new, used or repossessed, presently owned or hereafter acquired ... all accounts, contract rights, documents, accounts receivable, general intangibles, chattel paper, books and records, presently existing or hereafter acquired; together with ... the proceeds of any of the foregoing ..."

On December 22, 1986 the ITT Commercial Finance Corporation (hereinafter "ITT") filed a U.C.C.1 financing statement with the California Secretary of State's Office which purported to cover

> "[a]ll inventory, raw materials, goods in process, finished goods, machines, machinery, furniture, furnishings, fixtures, vehicles, equipment, accounts receivable, book debts, notes, chattel paper, acceptances, rebates, incentive payments, drafts, contracts, contract rights, choses in action, and general intangibles, whether now owned or hereafter acquired, and all attachments, accessions and additions thereto, substitution, accessories, and equipment therefor, and replacements and proceeds.

ITT then sent its purchase money notification letter by certified mail to GECC on December 29, 1986. Both ITT and GECC, as well as numerous other finance agencies not involved in this motion, thereafter supplied inventory to SUNRISE for sale in its ordinary course of business. GECC does not dispute that ITT had a perfected security interest in the vehicles it had sold to the Debtor and which the Debtor still held in inventory when the petition was filed.

In early December, 1988, ITT discovered that the proceeds from the sale of three recreational vehicles financed by ITT could not be accounted for. Immediate payment for the units was demanded and the total indebtedness owing from SUNRISE to ITT was subsequently deemed due and payable pursuant to the terms of the security agreement executed by and between them. On December 15, 1988, SUNRISE filed a voluntary Chapter 11 petition in bankruptcy and relief was granted on that date.

Upon notice of SUNRISE's bankruptcy, ITT immediately sought and received an order from this court designed to enforce the cash collateral provisions of 11 U.S.C. § 363 and to provide adequate protection to ITT. The December 28, 1988 order provided, inter alia, that all proceeds from the sale of any financed inventory would be immediately deposited by SUNRISE into a specially created and labelled cash collateral account and would not be withdrawn except upon application and order of this court. Furthermore, the order provided that

"3. [a]ll sales of inventory by the Debtor shall be for cash, except as follows:

credit sales, may be permitted as long as the full purchase price is received by the Debtor within 15 days of the date of sale. **In no event shall delivery b(e) made to a buyer of any inventory without receipt by the Debtor of the full purchase price in cash."** (Emphasis added).

A cash collateral account was subsequently established at the Security Pacific National Bank on January 5, 1989.

On January 20, 1989, this court denied (with certain delineated exceptions [1]) SUNRISE's motion to use any cash collateral in the regular course of its business finding that the debtor was unable to provide adequate protection to the secured parties with an interest therein. Further, the court ordered the termination of the automatic stay for the purpose of allowing ITT, GECC, and Chrysler First Wholesale Credit, Inc. (Chrysler First) to repossess and resell any inventory in possession of SUNRISE which they had individually financed.[2] The order further provided that all funds received by SUNRISE with the exception of those received for repair work would be immediately deposited into the cash collateral account. Finally, Kathy Adams (ADAMS), the bookkeeper for SUNRISE, was instructed to furnish the court and secured creditors with specified information and accountings relating to the disposition of inventory and the proceeds of sale.

The SUNRISE case was converted to Chapter 7 on March 7, 1989. On April 19 ITT filed this motion for approval to recover its claimed share of $71,837.40 from the approximately $191,782.92 [3] of proceeds

---

1. The parties stipulated to payment of SUNRISE bookkeeper Kathy Adams' salary and certain Department of Motor Vehicle fees.

2. Pursuant to the above order granting relief from stay, most of SUNRISE's inventory was repossessed by the above-designated financiers and auctioned off under the supervision of the Chapter 7 trustee on April 29, 1989. The rights

and priorities of the various parties in interest to the proceeds of the auction is a matter which will be resolved at a later date and upon proper motion or the filing of an adversary complaint.

3. According to Ex. "B" of the ADAMS declaration (filed 5/15/89) the principal amount of $191,782,92 had been deposited into the cash collateral account as of January 30, 1989:

| Date Sold Customer | Down Payment | Flooring Amount | Flooring Company | Deposit to C/C Acc't |
|---|---|---|---|---|
| 12/17 Lewis | $ 8,870.20 | $ 6,163.00 | GECC (1/12) | $ 6,163.00 |
| 12/22 Ede | $ 1,000.00 | $37,273.00 | CFWC (1/12) | $ 6,590.00 |
| 12/18 Faraoni | $ 1,050.00 | $ 9,427.00 | GECC (1/12) | $ 9,427.00 |
| 12/17 Iverson | $ 4,200.00 | $15,391.00 | GECC (1/9) | $ 18,000.00 |

then existing in the SUNRISE cash collateral account. Following the preliminary hearing on this matter on May 19, 1989, this court rendered an interim order which authorized, pursuant to a stipulation reached by and between the interested parties, the following distributions pending a final hearing on the matter set for June 20, 1989:

| | |
|---|---|
| Chrysler First: | $ 45,774.30 |
| GECC: | $ 90,000.00 |
| ITT: | $ 37,000.00 |
| Total: | $172,774.30 |

Following the above-referenced interim distribution, only GECC, ITT, Yegen Associates, and John and Alice Carr asserted an interest in the cash collateral funds. However, pursuant to this court's findings in its September 28, 1989 order addressing the related Motion JAP–1 (filed 4/19/89) that neither Yegen & Associates nor John and Alice Carr have any cognizable interest in the cash collateral proceeds, the field has been narrowed to GECC, ITT, and Chrysler First [4].

### ISSUES

GECC objects to ITT's motion for distribution, claiming a superior interest in cash collateral funds to the extent that the cash proceeds from the sale of ITT inventory were not "received on or before delivery of the inventory to a buyer" as required by California Commercial Code (hereinafter "Com.Code") § 9312(3). GECC furthermore contends that ITT has failed to adequately trace into the cash collateral account any sale proceeds it might otherwise have had an interest in. Finally, GECC contends in the alternative that any purchase money priority allowed to ITT should be limited to the "cost value" or actual amount financed by the financier.

### DISCUSSION

i) *Jurisdiction*

■ Because the above-entitled civil proceeding "arises in or [is] related to" a case under title 11 of the United States Codes, this court maintains "original jurisdiction" over the matter. (28 U.S.C. § 1334). Furthermore, as proceedings concerning the administration of the estate (28 U.S.C. § 157(b)(2)(A)), determinations of the validity, extent, or priority of liens (28 U.S.C. § 157(b)(2)(K)), and other matters affecting the liquidation of the assets of the estate (28 U.S.C. § 157(b)(2)(O)) are considered "core proceedings", this court has the authority to enter final orders in respect thereto. (28 U.S.C. § 157(b)(1)).[5] Finally, as the underlying subject matter of this motion is a dispute over interests in proceeds from the post-petition sale of the Debtor's inventory of recreational vehicles

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12/31 | Lewis | $ 9,907.00 | $29,462.60 | ITT | (1/12) | $ | 7,506.03 |
| 1/4 | Schei | $17,000.00 | $11,545.00 | GECC | (1/18) | $ | 15,689.20 |
| 1/6 | Bonnet | $ 1,000.00 | $11,832.00 | GECC | (1/18) | $ | 14,470.68 |
| 1/12 | Salmon | $ 2,000.00 | $22,578.00 | ITT | (1/30) | $ | 29,578.90 |
| 1/13 | Smith | $11,623.00 | $ 7,132.00 | GECC | (1/27) | $ | 10,770.76 |
| 1/12 | Goeb | $17,633.00 | $12,607.00 | GECC | (1/18) | $ | 17,315.00 |
| 1/11 | Anderson | $44,823.88 | $36,578.50 | ITT | (1/18) | $ | 2,963.38 |
| | | | | | (1/27) | $ | 31,789.09 |
| 1/18 | Justice | $12,500.00 | $14,309.00 | GECC | (1/27) | $ | 11,049.88 |
| 1/23 | Mitchell | $11,531.20 | $11,625.00 | GECC | (1/27) | $ | 10,470.00 |
| | | | | | Total | | $191,782.92 |

**4.** Chrysler First did not appear at the June 20, 1989 hearing nor did it submit any points and authorities in support of or opposition to this motion once it received the referenced payoff.

**5.** The court notes that a proceeding to determine the "extent of a lien or other interest in property" is more appropriately entertained by way of an adversary proceeding (Bankruptcy Rule 7001 et seq.). However, there being no objection to the form of the proceeding and it appearing that all parties were properly noticed and given sufficient opportunity to be heard, this court finds that the interests of justice would be more fully served by determining the merits of said motion without further delay.

pursuant to a cash collateral order of this court, this court not only has the authority, but perhaps the duty, to enforce its orders. 11 U.S.C. § 105, *In re China Peak Resort,* 847 F.2d 570 (9th Cir.1988) rev'd on other grounds, *sub nom. California State Board of Equalization v. Sierra Summit, Inc.* —— U.S. ——, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989).

ii) *Priority of ITT's Purchase Money Security Interest in Proceeds from the Sale of its Inventory*

As was set forth in the findings of facts above, both ITT and GECC claim virtually identical interests in SUNRISE's inventory, accounts, and proceeds pursuant to the content of their security agreements and filing statements. Both creditors sought additional security by utilization of an after-acquired property clause as permitted by Com.Code § 9204(1). Both of them acknowledge that the general "first to file [a financial statement]" rule of Com.Code

§ 9312(5)(a) determines their priority rights in any of SUNRISE's after-acquired property in which they otherwise had no initial or prior interest [6].

GECC clearly filed and perfected its security interest in SUNRISE inventory, proceeds, and accounts, etc. prior to the time ITT filed its conflicting security interest. As ITT points out however, it held a validly perfected "purchase money security interest" [7] (hereinafter "PMSI") in certain specified inventory held by SUNRISE when the petition was filed. ITT argues that *all* cash proceeds from post-petition sales of those items of inventory would take priority over GECC's security interest in the same proceeds, citing Com.Code § 9312(3) [8] and the protective order of December 28, 1988. GECC disagrees, observing that the express language of § 9312(3) limits a PMSI's interest in proceeds to those "identifiable cash proceeds received on or before the delivery of the inventory to a buyer ..." [9], and arguing that SUNRISE did not,

---

**6.** Perhaps it is because of the "first in time" rule that both ITT and GECC stipulated to the payment of Chrysler First's claim in full out of the cash collateral account. The motive or the basis for the stipulation is unclear to the court. In any event, there is no indication in the record that the Chapter 7 Trustee has accepted the total amount claimed by Chrysler First as correct. (See notes 15 & 16, infra).

**7.** Defined at Com.Code § 9107.

**8.** Com.Code § 9312(3) sets forth the following rule:

(3) A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also **has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer** if all of the following occur:

(a) The purchase money security interest is perfected at the time the debtor receives possession of the inventory.

(b) The purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party, or (ii) before the beginning of the 21–day period where the purchase money security interest is temporarily perfected without filing or possession (subdivision (5) of Section 9304).

(c) The holder of the conflicting security interest receives the notification within five years

before the debtor receives possession of the inventory.

(d) The notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.
(Stats.1963, c. 819, § 9312. Amended, inter alia, by Stats.1985, c. 606, § 1. (Emphasis added)).

ITT has provided substantial and unrefuted evidence that it has properly complied with and satisfied the requirements of provisions (a) through (d) of § 9312(3). (See Ex's "A", "B" to 12/28/88 Hoffman Declaration, Ex. "C" to 1/12/89 Hoffman Declaration).

**9.** See Generally; Grant Gilmore, *Security Interests in Personal Property* (1965) at § 29.4, p. 791–797; R.D. Henson, *Secured Transactions Under The Uniform Commercial Code* (1973) at § 5–4, p. 79 et seq.; Coogan and Gordon, *The Effect of the Uniform Commercial Code upon Receivables Financing—Some Answers and Some Unresolved Problems,* 76 Harv.L.Rev. 1529 (1963); B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code,* Priorities, at ¶ 3.09[3][c], p. 3–107 (1988). The impetus for amending § 9312(3) to include language granting a purchase money lender a priority in "identifiable cash proceeds received on or before the delivery of the inventory to a buyer" was, evidently, to eliminate the confusion which existed prior to the 1976 amendment over whether the priority enjoyed by a purchase money security lender with respect to inventory collateral extended to accounts receivable. The

in all instances, receive the cash sales proceeds before delivering possession to the buyers of the recreational vehicles.

It is clear enough under the Commercial Code, as GECC argues, that to the extent cash proceeds are not received on or before the date the inventory is delivered to the buyer, a senior perfected interest in "accounts" (i.e., GECC's) would attach and defeat the statutory priority afforded the purchase money lender under the general rule of Com.Code § 9312(5)(a). Nonetheless, GECC's argument must fail. Not only is there no direct or circumstantial evidence which even remotely supports GECC's contention that delivery of the ITT financed inventory to the buyer in fact preceded the tender of the cash down payment to SUNRISE,[10] but also such conduct would have blatantly violated the express terms of this court's December 28, 1988 order which unambiguously provided that "[i]n no event shall delivery b(e) made to a buyer of any inventory without receipt by the Debtor of the full purchase price in cash."[11] GECC should not be permitted to enhance its position because of the failure of the Debtor to comply with a cash collateral order pursuant to 11 U.S.C. § 363. That section was designed to permit Debtors to use a secured creditor's collateral in reorganization proceedings without impairing that creditor's rights to recover its collateral or the proceeds therefrom in the event of default or liquidation. As between secured creditors holding conflicting security interests in the same collateral, therefore, a cash collateral order should protect all parties and maintain the status quo as equitably as possible. The intent behind the Orders of December 28 and January 20 was to permit SUNRISE to sell its floored inventory, but only if the secured creditors' liens attached to the sales proceeds in the same priority and extent as existed before the sale was made. To have provided otherwise would have been to deny the secured creditors the adequate protection required by 11 U.S.C. § 363(e). Consequently, there being no basis in law or fact for a contrary conclusion, this court finds that the cash proceeds from the sale of ITT financed inventory were received before or contemporaneously with the delivery of said vehicles to the respective buyers.

### iii) Extent to which Proceeds are "Identifiable" Pursuant to Com.Code § 9312(3)

Having determined that ITT has, at the very least, access to the protections of a purchase money lender pursuant to Com. Code § 9312(3), the issue becomes whether said proceeds are sufficiently "identifiable" to allow complete recovery. The Commercial Code does not define "identifiable" proceeds or offer any clues as to the burden or extent of proof necessary to sufficiently "identify" proceeds from the sale of collateral.[12] Courts have generally resorted to pre-Commercial Code trust law tracing concepts to fill the void. (9 Anderson, *Uniform Commercial Code*, Secured Transactions, § 9–306:25 at p. 152; *Maxl Sales Co. v. Critiques, Inc.*, 796 F.2d 1293 (10th Cir. 1986) citing, inter alia, *Brown and Williamson Tobacco Corp. v. First Nat'l Bank*, 504 F.2d 998 (7th Cir.1974)).

1976 amendment purported to resolve the issue by expressly limiting the priority status of the purchase money lender to "cash proceeds", leaving the issue of priority as to subsequently received "accounts" (Com.Code § 9106) to be determined by reference to the general provisions of § 9312(5) (supra), there being no other provision governing the priority of conflicting interests in accounts receivable.

10. The only fact presented to support GECC's contention is that the proceeds from the sale of the ITT financed inventory were not deposited into the special cash collateral account until sometime after the sale was consummated. This observation, however, does nothing to establish the actual transfer date of *possession*, nor does it conclusively establish when full payment was tendered.

11. It does appear, however, that SUNRISE did not strictly comply with the terms of the December 28 Order, because not all the cash proceeds were deposited promptly into the cash collateral account. (See footnote 3, supra).

12. The court notes that proceeds of sales made under the supervision of the bankruptcy court are not subject to the provisions of Com.Code § 9306(4). (*Matter of San Juan Packers, Inc.*, 696 F.2d 707, 711 (9th Cir.1983)).

■ The relevant evidence establishes that the proceeds from the sale of ITT collateral have been sufficiently traced into the cash collateral account and, consequently, are "identifiable" for the purposes of Com.Code § 9312. Pursuant to this court's January 20, 1989 order, ADAMS submitted a declaration and an accounting of the post-petition sales conducted by SUNRISE. Among the exhibits attached to her declaration were several schedules maintained during the regular course of business entitled "Units Sold, New & Used, January 1989" and "Vehicles Sold—New, December 1988". The following pertinent information regarding the disposition of the three ITT financed vehicles was documented as follows:

| Date Sold Customer | Down Payment | Flooring Amount | Sales Price | Deposit to C/C Acc't | Date |
|---|---|---|---|---|---|
| 12/31 Lewis | $9,907.00 | $29,462.60 | $33,264.14 | $ 7,506.03 | (1/12) |
| 1/12 Salmon | $2,000.00 | $22,578.00 | $35,578.90 | $29,578.90 | (1/30) |
| 1/11 Anderson | $44,823.88 | $36,578.50 | $44,823.88 | $ 2,963.38 | (1/18) |
|  |  |  |  | $31,789.09 | (1/27) |

The above information, having been documented by a disinterested party, reflects that the net proceeds from the "Lewis" and "Salmon" sales were directly (albeit tardily) deposited into the cash collateral account.[13]

The record does reflect, however, that $31,789.09 attributed to the "Anderson" sale was in fact transferred from the general account to the cash collateral account on or around January 27, 1989. There exists, consequently, a possibility that the funds in the general account dropped below the amount held in trust for ITT thereby impairing the constructive presumption that those proceeds still existed on the date of transfer to the cash collateral account. (See generally, 7 Witkin, *Summary of California Law* (1984), Trusts, at § 88 et seq.; 60 Cal.Jur.3d Trusts, at § 359; 76 Am. Jur.2d, Trusts, at § 259 et seq.). Nonetheless, as was determined above, GECC will not be permitted to bootstrap its position at the expense of ITT. To the extent the cash proceeds came from the sale of inventory in which ITT had a PMSI, those proceeds must be attributed to ITT's interest in the cash collateral account.

iv) *"Purchase Money Security Interest" limited to Amount Financed*

■ This court will, nonetheless, sustain GECC's objection that ITT be limited in its recovery to the "cost value" of its inventory (that is, the flooring amount or price to the dealership). 11 U.S.C. § 552(b) provides as follows:

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title [all inapplicable to this case], if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case **to the extent provided by such security agreement and by applicable nonbankruptcy law,** except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. (Emphasis added).

---

**13.** GECC's allegation that the proceeds from the Salmon transaction were originally deposited into SUNRISE's general account and only later transferred to the cash collateral account is without foundation. Although Ex. "C" to ITT's moving papers reflects that a Bank of America cashier's check in the amount of $29,578.90 was directly deposited into the cash collateral account, the court notes that Bank of America in fact financed Salmon's purchase of the vehicle. Furthermore, the purchaser of the check appears to be "Salmon" (the photocopy of the check was not very clear). Consequently, the better conclusion is that the check was not drawn from SUNRISE's general account with that bank.

The court has already determined that ITT has properly perfected its PMSI in proceeds from the sale of its collateral. The issue, therefore, is whether "applicable nonbankruptcy law" or, in this case the Commercial Code, limits a properly perfected interest in "proceeds" to proceeds up to the amount of the cost value of the collateral.

■ Absent clear evidence of a contrary intent, this court will interpret a code provision according to its plain meaning. (*In re Mark Anthony Construction, Inc.*, 886 F.2d 1101 (9th Cir.1989) at 1105–06 (citations omitted)). According to Com.Code § 9107, a "Purchase Money Security Interest" is a PMSI "**to the extent that it is**

(a) [t]aken or retained by the seller of the collateral to secure all or part of its price; or

(b) [t]aken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." (Stats.1963, c. 819, § 9107 (Emphasis added)).

Com.Code § 9312(3), which limits the priority of a PMSI in inventory, cannot, as ITT argues, modify Com.Code § 9107 which defines a PMSI as limited to the original flooring price of the inventory so as to increase the definitional limitation.[14] Consequently, ITT will be restricted to recovering the flooring amount of each vehicle from the identifiable proceeds in the cash collateral account.

## DISPOSITION

Pursuant to the above memorandum of decision, this court finds that ITT had a PMSI in identifiable proceeds held in the SUNRISE cash collateral account in the amount of $64,837.40 as set forth below:

| Customer | Flooring Amount | Flooring Company | Deposit to C/C Acc't | Recoverable Amount |
|---|---|---|---|---|
| 12/31 Lewis | $29,462.60 | ITT | $ 7,506.03 | $ 7,506.03 |
| 1/12 Salmon | $22,578.00 | ITT | $29,578.90 | $22,578.90 |
| 1/11 Anderson | $36,578.50 | ITT | $ 2,963.38 | $ 2,963.38 |
|  |  |  | $31,789.09 | $31,789.09 |
|  |  |  |  | $64,837.40 |

Thus, Deducting the $37,000.00 already disbursed to it pursuant to this court's order issued on May 16, 1989, ITT is entitled to recover an additional $27,837.40.

The court notes that because $172,774.30 was disbursed to the referenced parties pursuant to this court's May 19, 1989 order, only $19,008.62 (plus accrued interest, if any) remains in the cash collateral account for application towards the $27,-837.40 balance owed ITT. Consequently, although the Trustee will be authorized to distribute the balance of the funds remaining in the cash collateral account to ITT, any deficiency existing thereafter must be satisfied via a proportionate disgorgement by GECC[15] from the overpayment made to

**14.** Although this court agrees with ITT that the definition of "proceeds" (Com.Code § 9306(1) *) was intended to be broad, §§ 9107 and 9312 expressly govern the treatment of PMSIs. Consequently, § 9312 must be construed in a manner consistent with the plain meaning of § 9107 to the greatest extent possible. To incorporate the all-inclusive § 9306(1) definition of proceeds into § 9312(3) would necessarily and unjustifiably defeat the limiting language in § 9107.

*§ 9306(1) defines "proceeds" as "includ[ing] whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'noncash proceeds.'"

**15.** Although the parties stipulated to the May 19th Order which permitted the disbursement of a portion of the funds in the cash collateral account, they all, except for Chrysler First, did so without prejudice to their respective rights in the fund. The Trustee may not be bound by the stipulation, however, and the claim of First Chrysler may be objectionable, particularly as to the extent of its security in the cash collateral account.

it pursuant to the Order of May 19, 1989.[16]

The above memorandum of decision constitutes this court's finding of fact and conclusions of law. Counsel for ITT will forthwith prepare and submit a separate, proposed judgment consistent herewith.

---

**16.** The court acknowledges ITT's objections to the extent of GECC's lien against the cash collateral fund (particularly that which addresses compliance, or lack thereof, with Com.Code § 9504(3)) and does not intend to prejudice its right to reassert those objections at a later date should the opportunity arise. However, ITT's interest in the cash collateral proceeds has been completely determined by this decision and, at least for the moment, this court is satisfied (notwithstanding the fact that no proof of assignment from General Electric Credit Corporation to GECC has been introduced) that GECC has properly perfected a senior security interest in SUNRISE's accounts receivable, after ac-

quired inventory, and proceeds therefrom and, consequently, can retain the funds it has thus far acquired from the cash collateral account (with the exception of the above-referenced disgorgement).