[No. A058296. First Dist., Div. One. Aug. 17, 1993.]

CHRYSLER CREDIT CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
STATE BOARD OF EQUALIZATION et al., Real Parties in Interest.

## Counsel

Steefel, Levitt & Weiss, Leonard R. Stein and Stephenie Foster for Petitioner.

No appearance for Respondent.

Daniel E. Lungren, Attorney General, Richard F. Finn and Joyce E. Hee, Deputy Attorneys General, for Real Parties in Interest.

## Opinion

**STEIN, J.**—East County Dodge was in the business, among other things, of selling vehicles supplied to it by Chrysler Credit Corporation (Chrysler) under a security agreement. For reasons which will be discussed, East

County Dodge ostensibly deposited the proceeds from the sales of the vehicles in an account at Bank of the West to which both it and Chrysler were signatories. Chrysler ultimately obtained a writ of possession against the funds held in that account. The State Board of Equalization and the Employment Development Department filed third party claims against the same funds. (Hereafter, except as indicated, these agencies will be referred to as third parties.) Chrysler here appeals the superior court's denial of its motion to dismiss the third party claims.

An appeal from this order is premature. The appeal should be taken from a judgment determining the validity of the third party claim. (Code Civ. Proc., § 720.420.) There appears, however, to be no real issue as to the validity of the third party claims; rather, the only issue of any substance was whether third parties were entitled to satisfy their claims out of the account at issue. The order, therefore, in determining that third parties were so entitled, has the same practical effect as a final judgment determining the validity of the third party claims. In the interest of justice, we will treat the appeal as a petition for writ of mandate to compel the superior court to vacate its order and will consider the issues presented. (See *Branham* v. *State Farm Mut. Auto. Ins. Co.* (1975) 48 Cal.App.3d 27, 32 [121 Cal.Rptr. 304].)

*Factual/Procedural Background*

The essential facts are not in dispute.

On September 13, 1988, Chrysler entered into a master credit agreement with East County Dodge by which Chrysler agreed to provide financing to East County Dodge for the purpose of purchasing new vehicles from Chrysler and used vehicles from their sellers. The agreement gave Chrysler a "first and prior security interest" in every vehicle financed under the agreement and "all proceeds thereof." Chrysler perfected its security interest by filing its financing statement on October 6, 1988. (See, generally, Cal. U. Com. Code, §§ 9203, 9302, subd. (1)(a), and 9306.)

East County Dodge began having financial problems, and in April 1990, filed a chapter 11 petition in the United States Bankruptcy Court. As part of those proceedings, the bankruptcy court authorized East County Dodge to sell vehicles financed by Chrysler under its master credit agreement, and ordered East County Dodge to "deposit into a special trust account . . . in the name of East County Dodge and Chrysler the . . . wholesale value upon the debtor completing a sale of any . . . collateral vehicles (i.e., the vehicles secured under the security agreement.)" In purported compliance with this order, East County Dodge opened a trust account with the Bank of America

for the deposit of funds received from the sales of collateral vehicles. East County Dodge later, with the agreement of Chrysler, moved those funds into an account at Bank of the West—the account at issue here. For purposes of clarity, we will adopt Chrysler's practice and refer to this account as the "cash collateral account."[1] Thereafter, in connection with any sale of a financed vehicle, East County Dodge provided Chrysler with information referring to that sale, including the purchaser, the price, and a copy of the vehicle's invoice. East County Dodge also forwarded to Chrysler copies of bank deposits reflecting amounts deposited into the cash collateral account. East County Dodge, however, did not directly deposit the funds from the sales of collateral into the cash collateral account. Rather, it deposited these funds into its general operating account and, then, from time to time withdrew funds from the general account and deposited them into the cash collateral account. Thus, Armand Frumenti, the president of East County Dodge, declared, as relevant: "The usual practice of East County Dodge, Inc. was to initially deposit all proceeds, including monies received from the sale of automobiles, automotive parts and remuneration for automotive repair services, into the general operating bank account . . . . Thereafter, monies were periodically transferred from the general operating bank account to the debtor-in-possession bank account by way of a check written against East County Dodge, Inc.'s general operating bank account to the East County Dodge, Inc.'s debtor-in-possession bank account."

Thus, it was East County Dodge's practice to deposit the full purchase price, including sales tax, of vehicles into the general operating account. Chrysler, of course, had no security interest in the sales tax. In addition, Chrysler had no security interest in the funds received by East County Dodge for labor, and these funds, too, were deposited into the general operating account. It follows that the funds in which Chrysler had a security interest—the proceeds of sales of collateral—were commingled with other funds.[2] The record contains no evidence tracing those funds to any account or entity other than to the cash collateral account. As Chrysler concedes, however, the general operating account regularly reflected a negative balance. Apparently, the Bank of the West would cover the checks drawn on the account and would then use the following day's deposits to recover the overdraft. As Chrysler asserts, "During this time, and without Chrysler's knowledge, Bank of the West allowed a $282,000 overdraft balance to build-up in the Operating Account. [East County Dodge] deposited funds to

---

[1] Third parties refer to this account as the "debtor-in-possession bank account." The superior court's judgment refers to it as the "so-called Cash Collateral Account." For purposes of continuity, we will refer to it as the cash collateral account.

[2] Indeed, from July 25, 1990, to December 18, 1990, East County Dodge deposited $1,782,883.85 into its operating account. For the same period Chrysler claimed proceeds from sales of collateral of only $353,131.82.

reduce the overdraft balance and the Bank continued to honor overdrafts, by advancing its own funds."

The bankruptcy proceedings were dismissed on May 1, 1991. On May 8, Chrysler filed a complaint, seeking as relevant here, to recover the funds held in the cash collateral account. In the meantime, third parties levied against East County Dodge's bank accounts, including the cash collateral account, claiming that East County Dodge owed the State Board of Equalization $211,165.07, plus interest, and the Employment Development Department $23,600.54. Chrysler obtained a writ of possession as to the cash collateral account on June 24, 1991. Third parties subsequently filed third party claims, claiming an interest in the funds held in that account.

## DISCUSSION

As all parties agree, the basic issue is whether the court erred in determining that Chrysler had no perfected security interest in the funds in the cash collateral account, a finding which means that the Board of Equalization and the Employment Development Department have the right to levy against those funds, and that their claims have priority over any claim Chrysler has to the funds as an unsecured creditor.[3] There is no question but that Chrysler had a perfected security interest in the collateral—the financed automobiles—itself. The question, rather, is whether the funds deposited into the cash collateral account are the "identifiable proceeds" of the collateral such that Chrysler's security interest attached also to them. (Cal. U. Com. Code, § 9306, subd. (2).)[4]

Chrysler's position is that the funds were intended to be, and were, receipts from the sales of the collateral. The third parties' position is that by depositing the amounts received upon sale of the vehicles into the general account and then withdrawing funds from that account and depositing them into the cash collateral account, East County Dodge so commingled the proceeds with other funds that they are not "identifiable" as proceeds from the sales. The superior court adopted this position, finding that "Chrysler has failed to establish that the contents of the so-called Cash Collateral Account constitute 'identifiable cash proceeds' from the sale of its collateral."

---

[3]See, generally, California Uniform Commercial Code section 9301, subdivision (1); Code of Civil Procedure section 697.590, subdivision (b); Code of Civil Procedure section 688.020; and Unemployment Insurance Code section 1785.

[4]California Uniform Commercial Code section 9306 provides, as relevant here: "(1) 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. . . . Money, checks, deposit accounts, and the like are 'cash proceeds.' . . . [¶] (2) Except where this division . . . otherwise provides, a security interest continues in . . . any *identifiable proceeds* including collections received by the debtor." (Italics added.)

## I.

*The Court Did Not Improperly Shift the Burden of Proof*

■ Chrysler argues that the superior court improperly placed the burden of proof on it rather than on the third parties.[5] Once third parties introduced evidence that the funds in the cash collateral account were not the direct proceeds of the sales of the collateral, the court placed the burden on Chrysler to show that the funds, nonetheless, were the identifiable proceeds of those sales. We do not believe that the court thereby improperly shifted the burden of proof.

Initially, although no California case appears to have so stated, the general rule is that the secured party (here, Chrysler) has the burden of tracing funds received from the sales of collateral so as to show that they are in fact the identifiable proceeds of those sales. (E.g., *Farmers Bank* v. *Production Credit Ass'n* (1988) 243 Kan. 87 [755 P.2d 518, 527].) ■ Chrysler argues, however, that "Based on the principles of bankruptcy law, the clear mandate of the third party claim statute imposing the burden of proof on the third party claimant, and principles of equity, Chrysler should *not* as a matter of law be required to trace funds."

The bankruptcy law alluded to by Chrysler is that which authorizes a bankruptcy trustee to segregate cash collateral. (11 U.S.C. §§ 363(c)(4) and 1108.) In addition, the bankruptcy court in the present case specifically directed East County Dodge to deposit the proceeds of the sales of collateral into the cash collateral account. Under the bankruptcy court's ruling, therefore, East County Dodge owed a duty to Chrysler to deposit the funds in that account. There is no real question but that East County Dodge breached that duty. In such a situation, principles of equity may make it appropriate to shift the burden of tracing funds from Chrysler, as the secured party, to East County Dodge as the party guilty of wrongdoing. There would, however, be no equity in shifting the burden of tracing to third parties. ■ The relevant equitable principle was stated by the court in *United States* v. *Hayes* (9th Cir. 1966) 369 F.2d 671, 676: "It is well settled that in the interest of fairness the burden of proof ordinarily resting upon one party as to a disputed issue may shift to his adversary when the true facts relating to the disputed issue lie peculiarly within the knowledge of the latter." ■ This principle was at issue in *Freightliner Market Dev.* v. *Silver Wheel*

---

[5]Chrysler cites the court's finding, noted above, that Chrysler failed to establish that the funds were identifiable proceeds. Chrysler also points out that at the first of two hearings on the third party claims, the court stated, "The burden is on you and—that is on Chrysler, . . . to prove that these are identifiable proceeds, . . ."

*Freight.* (9th Cir. 1987) 823 F.2d 362, relied upon here by Chrysler. As relevant, Freightliner was a secured creditor, having a perfected security interest in the debtor's accounts receivable. The debtor, like East County Dodge in the present case, had declared bankruptcy and, accordingly, had a duty to segregate the cash collateral derived from the collection of the accounts receivable covered by Freightliner's security interest. As did East County Dodge, the debtor breached that duty and commingled the cash collateral with other funds. The action involved the competing rights of the bankruptcy trustee and the secured party to certain funds in possession of the debtor, which might or might not have included the identifiable proceeds of the cash collateral. The court held that under the circumstances, the burden of tracing the funds would be shifted to the trustee: "[W]e find that notions of equity and fairness support the bankruptcy court's shift of the burden of proof on the issue of tracing to the Trustee. [Citation.] This is especially true where, as here, the Trustee's predecessor, the debtor's, breach of duty has created the confusion preventing proof of the issue." (*Id.* at p. 369.) This holding stands for nothing more than that where the debtor wrongfully commingles the funds, the debtor, or its representative, should bear the burden of tracing them. It follows that, as between competing claims of Chrysler and East County Dodge as the wrongdoing debtor,[6] the burden of tracing the funds might be shifted to East County Dodge. But the present contest is between Chrysler and third parties. In such a situation, the same principles of equity would authorize a shift in the burden of proof only if third parties themselves had acted wrongfully. "Although the secured party usually has the burden of tracing proceeds of collateral, such a requirement may be waived when the collateral was fraudulently converted and the [competing] unsecured creditor had knowledge both of the disposition of the collateral and the secured party's interest in it." (*Farmers Bank* v. *Production Credit Ass'n, supra,* 755 P.2d at p. 527; and see, *C. O. Funk & Sons, Inc.* v. *Sullivan Equip.* (1982) 89 Ill.2d 27 [59 Ill. Dec. 85, 431 N.E.2d 370, 372].) There is no evidence here that third parties had knowledge of East County Dodge's breach of duty until after the funds had been commingled.

■ Finally, it is true, as Chrysler emphasizes, that the third party in a third party claim has the burden of proof. (Code Civ. Proc., § 720.360.) It does not follow, however, that third parties were required to prove that the proceeds of the sales of collateral could not be traced into the cash collateral account. ■ The court in *Rancho Santa Fe Pharmacy, Inc.* v. *Seyfert* (1990) 219 Cal.App.3d 875, 880 [268 Cal.Rptr. 505], explains: " ' "Burden

---

[6]Third parties point out that it may be argued that East County Dodge in fact complied with the order of the bankruptcy court, which specified only that the "wholesale value" of the collateral be deposited into the special bank account. East County Dodge did in fact deposit sums which appear to correspond to the wholesale value of the collateral.

of proof" means the obligation of a party to establish by evidence a *requisite degree of belief* concerning a fact in the mind of the trier of fact or the court.' [Citation.] The burden of producing evidence is 'the obligation of a party to introduce evidence *sufficient to avoid a ruling against him* on the issue.' [Citation.] [¶] Initially these burdens coincide. The party having the burden of proof must offer evidence so that the trier may have a basis for finding in his favor. [Citation.] During the course of the trial, however, the burden of producing evidence 'may shift from one party to another, irrespective of the incidence of the burden of proof.' "

■ In the present case, Chrysler filed suit to recover the funds in the cash collateral account, and third parties then filed claims against those funds. Absent the introduction of any evidence, Chrysler, not having the basic burden of proof, would prevail. Thus, third parties had the burden of producing evidence that they had a valid interest in the funds in the cash collateral account; a burden which, here, required them to bring in evidence (1) that the funds in the account were not the identifiable proceeds of the sales of the collateral, and (2) that their rights to the funds therefore were superior to that of Chrysler. Third parties met this burden by filing the Frumenti declaration that the funds in that account were not the direct proceeds of sales of the collateral but transfers of money from another account in which the proceeds were commingled with other funds to which Chrysler had no interest. ■ In addition, third parties showed that before Chrysler had obtained its writ of possession, each had filed a notice of levy against the cash collateral account. They accordingly had priority over any right Chrysler might have by means of its later-filed writ of possession. **(1d)** At this point, the burden of producing evidence shifted to Chrysler to refute the showing by third parties. The court therefore continued the matter so that Chrysler might bring in additional evidence that the proceeds of the collateral could, in fact, be traced into the cash collateral account.

The situation is analogous to that in *Lawler* v. *Solus* (1951) 101 Cal.App.2d 816 [226 P.2d 348], involving the rights of a mortgagor in a debtor's personal property, including a number of cows. The mortgagor obtained a writ of possession for the cows and a third party then filed a third party claim against them. **(6)** The third party introduced evidence that he in fact owned the cows but had contracted with the debtor that the debtor would feed and care for them. The relevant legal principle is that one who takes a chattel mortgage is protected against prior equities (such as the third party's ownership of the cows) only if he or she takes it for a valuable consideration and without notice. An issue arose as to who had the burden of proving that the mortgagor took without notice of the third party's ownership. The court concluded that once the third party had established title to

the cows, the burden was on the mortgagor to prove that he did not have notice that the cows belonged to the third party. (*Id.* at p. 818.) █ Similarly, here, once the third parties established that the proceeds from the sales of the collateral had not been deposited directly into the cash collateral account, the burden shifted to Chrysler to show that the account nonetheless contained the identifiable proceeds of those sales.

## II.

*The Evidence Supports the Trial Court's Conclusion That the
Funds in the Cash Collateral Account Are Not the Identifiable
Proceeds of the Sales of Collateral*

The question remains whether Chrysler met its burden of showing that the funds in the cash collateral account were in fact the proceeds of the sales of collateral. The trial court, on such evidence as was submitted by the parties, concluded that the funds in the account were not the identifiable proceeds of those sales. █ To the extent that the submitted evidence was conflicting, we must, of course, resolve those conflicts in favor of the trial court's conclusion. (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925].)

█ We do not agree, as third parties have argued, that the ability to trace the proceeds was destroyed the moment that they were commingled with other funds in the general operating account. Again, the issue has not been discussed in any California case, but the applicable principles of law appear to be well established. Addressing the argument that Professor Gilmore (see, generally, 2 Gilmore, Security Interest in Personal Property (1965) § 27.4, p. 732) theorized that commingling should destroy any identity of proceeds, the court in *Harley-Davidson Motor Co.* v. *Bank of New England* (1st Cir. 1990) 897 F.2d 611, 619-620, held: "The problem with this argument, however, is that the courts have subsequently, with virtual unanimity, rejected Professor Gilmore's early view. They have held that, in certain special circumstances, a secured party may trace 'identifiable proceeds' through a commingled bank account and into the hands of a recipient who lacks the right to keep them. [Citations.] . . . [¶] Courts, in justifying the use of tracing, have pointed out that the Code itself says that they are to supplement its provisions with general 'principles of law and equity.' [Citations.]" These principles ordinarily apply to permit tracing where the debtor has acted collusively with a stranger to the secured transaction and permit the secured party to trace funds transferred to the stranger. Such a situation is distinguished from that occurring where the stranger obtains funds from a commingled account in the ordinary course of business. (*Id.* at p. 620.) We see no reason why the

same principles should not apply here, where, although no collusion took place, the funds ostensibly were placed into the cash collateral account so that they would be available to Chrysler.

■ We also reject the third parties' argument that California Uniform Commercial Code section 9306, subdivision (4)'s limitations on secured proceeds have application to this case. Subdivision (4) provides only that insolvency limits a secured party's interest in funds received by the debtor *prior* to the institution of insolvency proceedings. It does not limit a secured party's interest in funds received during or after the proceedings.[7]

■ It follows that, as the superior court also concluded, Chrysler was entitled, if it could, to trace the proceeds through the operating account into the cash collateral account. As to each secured vehicle, Chrysler submitted evidence of (1) the date and amount of sale, (2) the amount of proceeds due to Chrysler for such sale, (3) the date the total proceeds from the sale were deposited into East County Dodge's general operating account, (4) the date funds, earmarked by East County Dodge as the amount due Chrysler, were deposited into the cash collateral account, and (5) the amount of these funds.

The California Uniform Commercial Code does not provide any aid in determining whether this information sufficiently traced the proceeds of the sales of collateral. We, as have other courts before us, will resort to principles developed in the common law. (E.g., *Harley-Davidson Motor Co. v. Bank of New England, supra,* 897 F.2d at pp. 620, 622; *GMAC v. Norstar Bank, N.A.* (1988) 141 Misc.2d 349 [532 N.Y.S.2d 685, 689].)

The common law rule applicable here is the "lowest intermediate balance rule" used in tracing trust funds. Witkin describes it: "If the trustee withdraws money and dissipates it, the trust funds are only those which remain on deposit. Subsequent deposits ordinarily do not inure to the benefit of the

---

[7]Subdivision (4) provides, as relevant: "In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in all of the following proceeds: [¶] . . . [¶] (b) In identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings. [¶] . . . [¶] (d) In all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is both: [¶] (i) Subject to any right of setoff. [¶] (ii) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within 10 days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on the account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraph[ ] . . . (b)."

trust. Hence, the beneficiary can have his prior lien only upon the *lowest intermediate balance* left in the account. And if at any time the trustee withdraws and dissipates the entire fund, the beneficiary loses all prior claim and is merely a general creditor of the trustee." (11 Witkin, Summary of Cal. Law (9th ed. 1990) Trusts, § 144 (3), p. 1000; see also Rest.2d Trusts, § 202, coms. j and k; Rest., Restitution, § 212; 5 Scott on Trusts (4th ed. 1989) § 518; Bogert, Trusts & Trustees (rev. 2d ed. 1983) § 929; but cf. *Church* v. *Bailey* (1949) 90 Cal.App.2d 501 [213 P.2d 547].) ▮▮▮ The court in *Ex Parte Alabama Mobile Homes, Inc.* (Ala. 1985) 468 So.2d 156, 160, elaborates: "When proceeds of a sale of collateral are placed in the debtor's bank account the proceeds remain identifiable and a security interest in the funds continues even if the funds are commingled with other funds. [Citation.] The rules employed to distinguish the identifiable proceeds from other funds are liberally construed in the creditor's favor by use of the 'intermediate balance rule.' [Citations.] This rule provides a presumption that proceeds of the sale of collateral remain in the account as long as the account balance equals or exceeds the amount of the proceeds. The funds are 'identified' based on the assumption that the debtor spends his own money out of the account before he spends the funds encumbered by the security interest. If the account balance drops below the amount of the proceeds, the security interest in the funds on deposit abates accordingly. This lower balance is not increased if funds are later deposited into the account. [Citation.] This rule is analogous to the presumption which arises when a trustee commingles trust funds with his own. [Citation.]"

▮▮▮ In the present case East County Dodge deposited the proceeds of the sales of collateral into its general operating account. Assuming no further action was taken, Chrysler's security interest attached to those funds notwithstanding that they were commingled with other funds. But further action was taken. It appears that East County Dodge maintained a deficit balance in its general operating account and that the Bank of the West applied any funds deposited into that account to reduce the indebtedness. Under the intermediate balance rule, any nonproceeds would be applied first to reduce East County Dodge's debt to Bank of the West. Once those funds were exhausted, however, and proceeds were attached, Chrysler's security interest in the funds abated. When East County Dodge deposited funds into the cash collateral account, it wrote checks against the general operating account. If at the time such a check was written the general operating account had a positive balance, and if the funds might be deemed proceeds under the intermediate balance rule, the funds taken from the general operating account and deposited into the cash collateral account were in fact the identifiable proceeds of sales of collateral. The evidence, however, is that at the time East County Dodge wrote these checks there were no proceeds in the

general operating account. Those funds, together with any other funds deposited, had been used to reduce the deficit in the account. Chrysler's security interest in the funds in the general operating account, accordingly, was reduced to zero. When Bank of the West honored the checks, it essentially advanced its own funds, increasing the deficit in the general operating account. Unless, as does not appear to be the case, Chrysler somehow obtained a security interest in these loan funds, it had no security interest in the funds deposited into the cash collateral account because they were not the proceeds of any sales of collateral; they were funds loaned by Bank of the West. (See *Bank of Santa Ana* v. *Molina* (1969) 1 Cal.App.3d 607, 617 [81 Cal.Rptr. 885].)

■ Chrysler urges us to adopt an exception to the intermediate balance rule. It has been held that where a trustee commingles personal funds with trust funds, and dissipates the commingled funds such that the trust funds are affected, and then deposits additional personal funds into the account, it may be presumed that the trustee was intending to reimburse the trust funds. In such a situation, the trust funds will be replenished. (*Mitchell* v. *Dunn* (1930) 211 Cal. 129, 134 [294 P. 386], *Church* v. *Bailey, supra,* 90 Cal.App.2d at p. 504; *In re California Trade Technical Schools, Inc.* (9th Cir. 1991) 923 F.2d 641, 646.) The case law does not recognize this exception in a situation such as exists here (but see *In re Sunrise R.V., Inc.* (Bankr. E.D.Ca. 1989) 107 B.R. 277 [10 U.C.C. Rep. Serv. 2d 219 (Callaghan)];[8] and in our view this exception, if broadly applied, would completely emasculate the rule. Rather, it is properly limited to contests between trustee and beneficiary, where the trustee essentially embezzles trust funds and subsequently intends to, and does, replace them. A different situation exists where, as here, third parties have competing interests in the funds at issue. Here, not only proceeds from the sales of collateral, but funds due other creditors, including third parties, were deposited into the general operating account. It would be inequitable to

---

[8]There were two secured creditors at issue in *Sunrise*. ITT Commercial Finance Corporation (ITT), having a purchase money security interest in specific inventory, had an interest in the proceeds of that inventory superior to that of the more general creditor, General Electric Credit Corp. (GECC). As here, the debtor declared bankruptcy and was ordered to deposit the proceeds from the sales of any of the specified inventory into a specially created and labelled cash collateral account. In connection with one of the sales, however, the documentation submitted by ITT indicated that the debtor, as here, had first deposited the proceeds into its general operating fund and subsequently transferred funds from that account into the cash collateral account. The court noted that there was, therefore, the possibility that the funds in the general operating account had dropped below the amount "held in trust for ITT thereby impairing the constructive presumption that those proceeds still existed on the date of transfer to the cash collateral account." (10 U.C.C. Rep. Serv. at p. 226) The court concluded, without citation to authority, that it would be improper to permit the other secured creditor, GECC, to "bootstrap its position at the expense of ITT," where the ability to bootstrap was the result of the debtor's wrongdoing. (*id.,* at p. 227)

conclude that after that account was reduced to zero, any money deposited into it belonged only to Chrysler. In addition, were we to adopt the position urged by Chrysler we would, in effect, be giving the debtor, rather than the Commercial Code, the power to determine priorities among creditors.[9] We decline to adopt such a rule. It follows that, as the trial court concluded, the funds in the cash collateral account are not the identifiable proceeds of the sales of collateral.

The superior court correctly denied the motion to dismiss the third party claims. The petition for writ of mandate, as we have so construed Chrysler's appeal, is denied.

Strankman, P. J., and Dossee, J., concurred.

---

[9]It might be supposed, for example, that a particular debtor has several secured creditors, and has been ordered to maintain a cash collateral account for each. Instead, the debtor deposits all funds into a general operating account, reduces that account to zero, and then deposits any additional, nonproceeds into one of the cash collateral accounts. Under Chrysler's position, that creditor would be deemed reimbursed whether or not it otherwise had priority over the other creditors.